70 Cal.Rptr.3d 372 (2008)
42 Cal.4th 945
174 P.3d 192
Adoption of JOSHUA S., a Minor.
Annette F., Plaintiff and Respondent,
v.
Sharon S., Defendant and Appellant.
No. S138169.
Supreme Court of California.
January 24, 2008.
*373 Blatchley & Blatchley, William E. Blatchley, San Diego; John L. Dodd & Associates and John L. Dodd, Tustin, for Defendant and Appellant.
Luce, Forward, Hamilton & Scripps and Charles A. Bird. San Diego, for Plaintiff and Respondent,
Jennifer C. Pizer. Brian Chase, Shannon Minter and Courtney Joslin, for Children of Lesbians and Gays Everywhere, Family Pride Coalition, Los Angeles Gay & Lesbian Center, Lambda Legal Defense & Education Fund, Lesbian & Gay Lawyers Association *374 of Los Angeles, National Center for Lesbian Rights, Our Family Coalition, Pop Luck Club, San Diego Family Matters and Tom Homann Law Association as Amid Curiae on behalf of Plaintiff and Respondent.
Rosen, Bien & Asaro, Andrea G. Asaro and Amy Whelan, San Francisco, for American Civil Liberties Union, Bay Area Lawyers for Individual Freedom, Legal Services for Children, Western Center on Law & Poverty, Youth Law Center and Protection & Advocacy, Inc., as Amici Curiae on behalf of Plaintiff and Respondent.
Shute, Mihaly & Weinberger, Ellison Folk, Robert S. Perlmutter, San Francisco, and Jenny K. Harbine, for Planning and Conservation League, Natural Resources Defense Council and Baykeeper as Amici Curiae on behalf of Plaintiff and Respondent.
Manning & Marder, Kass, Ellrod, Ramirez, Scott Wm. Davenport and Jason J. Molnar, San Diego, for Los Angeles County Bar Association and Beverly Hills Bar Association as Amici Curiae on behalf of Plaintiff and Respondent.
Judith E. Klein, La Mesa, for Minor.
MORENO, J.
In Sharon S. v. Superior Court (2003) 31 Cal.4th 417, 2 Cal.Rptr.3d 699, 73 P.3d 554 (Sharon S.), we validated a so-called "second parent" adoption, in which the same-sex partner of a birth mother adopted the mother's child, while the mother remained a coparent. Subsequently, the prevailing party in that case, Annette F. (Annette), sought attorney fees under the "private attorney general" attorney fee statute, Code of Civil Procedure section 1021.5,[1] to be paid by the losing party, Sharon S. (Sharon). The trial court awarded such fees but the Court of Appeal reversed. As will be explained at greater length below, the court concluded that because of Annette's large personal stake in the outcome of the litigation, she was not acting as an authentic private attorney general. We granted review to address that issue. We subsequently ordered supplemental briefing on the following question: Does section 1021.5 authorize an award of attorney fees against a litigant who has done nothing to adversely affect the rights of the public or a substantial class of people other than raising an issue in the course of litigation over private rights and interests that results in an important appellate precedent adverse to that litigant?
As explained below, we do not decide whether the trial court abused its discretion in determining that the extent and scope of the litigation transcended Annette's personal stake in its outcome. Rather, we hold that section 1021.5 does not authorize an award of attorney fees against an individual who has done nothing to adversely affect the rights of the public or a substantial class of people other than raise an issue in the course of private litigation that could establish legal precedent adverse to a portion of the public, and that therefore fees should not be awarded in the present case. As elaborated below, both the language and legislative history of section 1021.5 support this interpretation. We therefore affirm the judgment of the Court of Appeal on that basis.

I. STATEMENT OF FACTS
The facts are for the most part undisputed. Sharon and Annette were in a committed relationship from 1989 through mid-2000. In 1996 Sharon was artificially inseminated and gave birth to Zachary. While retaining her parental rights, Sharon consented to Annette's adoption of the *375 child. (Sharon S., supra, 31 Cal.4th at p. 422, 2 Cal.Rptr.3d 699, 73 P.3d 554.)
In 1999, Sharon was again artificially inseminated by the same sperm donor and gave birth to Joshua. Sharon and Annette made the same agreement allowing Annette to adopt Joshua while Sharon retained her parental rights. Thereafter the relationship between Sharon and Annette deteriorated and Annette left the family home. Annette filed a motion for an order of adoption. Sharon moved for court approval to withdraw her consent to adopt and to dismiss Annette's petition. Sharon relied on several arguments, including that the form of second parent adoption sought was unlawful. (Sharon S., supra, 31 Cal.4th at pp. 422-424, 2 Cal.Rptr.3d 699, 73 P.3d 554.)
The trial court denied the motion to dismiss the adoption. Sharon filed and the Court of Appeal granted a petition for writ of mandate, holding that the form of second parent adoption sought by Annette was without statutory basis. We granted Annette's petition for review and reversed, finding that second parent adoptions like that sought by her were lawful. We remanded the matter for resolution of factual issues related to Sharon's claim that her consent to the adoption had been gained by fraud and duress and to ensure that the relevant administrative and statutory requirements of the second parent adoption had been satisfied. (Sharon S., supra, 31 Cal.4th at pp. 445-446, 2 Cal.Rptr.3d 699, 73 P.3d 554.)
Before the resolution of the other issues, Annette moved for an award of attorney fees in the amount of $138,939.78 pursuant to section 1021.5. Annette sought the fees for legal services provided by her counsel, Charles Bird of the firm Luce, Forward, Hamilton and Scripps (Luce), in the Court of Appeal and Supreme Court leading to the decision in Sharon S.
Annette's supporting papers noted that although the matter was not yet fully resolved, Annette had prevailed in the Supreme Court on the second parent adoption issue, an issue of benefit to a large class of persons, and argued that she was therefore entitled to an award of fees pursuant to the private attorney general provisions of section 1021.5 for that portion of the case.
Bird, Annette's attorney, filed a declaration stating that he was initially approached in August of 2001 by someone who had written an amicus curiae brief or letter brief on Annette's behalf, when the matter was pending in the Court of Appeal, out of concern that the outcome of the case may have a far-reaching, detrimental effect. Bird eventually decided to represent Annette, and argued on her behalf in the Court of Appeal. When the Court decided against Annette solely on the ground that second parent adoption was without statutory basis, Bird prepared an unsuccessful petition for rehearing and then a successful petition for review in this court. He prepared the briefs and argued the case in this court, which included extensive analysis of the legislative history of the relevant statutes, a brief responding to the various amici curiae, an answer to Sharon's petition for rehearing and an answer to Sharon's petition for a writ of certiorari in the United States Supreme Court.
Bird's declaration further stated that Annette and Luce had entered into a written engagement agreement providing for payment of a fee at a described rate and for the reimbursement of expenses, with an estimation that the cost of oral argument in the Court of Appeal was likely to ran between $8,000 and $10,000. He discussed with Annette that if she lost in the Court of Appeal, the fees from continuing the litigation would likely outstrip her ability *376 to pay, but that he would continue to represent her on the second parent adoption issue because of his concern for the law made by the case. He explained that his firm would take the chance of prevailing and potentially recovering attorney fees based on the public benefit resulting from the work.
The trial court awarded $92,049.15 in attorney fees to Annette. The court found the Supreme Court's decision conferred a significant nonpecuniary benefit on a large class of persons and resolved an important issue of law. The trial court also concluded, for reasons elaborated below, that notwithstanding the fact that Annette had a personal stake in the outcome of the litigation, the cost of the litigation was out of proportion to that stake.
The Court of Appeal reversed. While not disputing that the litigation conferred significant benefits on a large class of persons and resolved an important issue of law, the court concluded that Annette's personal stake in the litigation, i.e., the vindication of her rights as an adoptive parent, were so large that a private attorney general award under section 1021.5 was not justified. In so concluding, the court rejected Annette's argument that nonpecuniary interests such as hers were not to be counted among the personal interests that could defeat a section 1021.5 award.
We granted review and subsequently sought the supplemental briefing described above.

II. DISCUSSION

A. The Necessity and Financial Burden Requirement
Eligibility for section 1021.5[2] attorney fees is established when "(1) plaintiffs' action `has resulted in the enforcement of an important right affecting the public interest,' (2) `a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons' and (3) `the necessity and financial burden of private enforcement are such as to make the award appropriate.'" (Woodland Hills Residents Assn., Inc. v. City Council (1979) 23 Cal.3d 917, 935, 154 Cal.Rptr. 503, 593 P.2d 200 (Woodland Hills).)
There is no question that the litigation here did yield a substantial and widespread public benefit. In Sharon S., supra, 31 Cal.4th at page 437, 2 Cal.Rptr.3d 699, 73 P.3d 554, we estimated that there were between 10,000 and 20,000 second parent adoptions in the state that would be jeopardized by the Court of Appeal ruling invalidating such an adoption. But Sharon and Annette disagree as to whether the third factor applies in the present case.
As this court has elaborated with respect to this third requirement (hereafter sometimes referred to as the necessity and financial burden requirement): "`An award on the "private attorney general" theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his *377 individual stake in the matter." [Citation.]'" (Woodland Hills, supra, 23 Cal.3d at p. 941, 154 Cal.Rptr. 503, 593 P.2d 200.) A court generally determines whether the litigation places a disproportionate burden on the individual by comparing the expected value of the litigation at the time it was commenced with the costs of litigation. (See Los Angeles Police Protective League v. City of Los Angeles (1986) 188 Cal.App.3d 1, 9-10, 232 Cal. Rptr. 697 (Los Angeles Police Protective League).)
The above method assumes that a plaintiff has a pecuniary interest in the litigation that is more or less quantifiable. What happens when a plaintiff has no pecuniary interest? Annette argues that when no pecuniary interest is present, a plaintiff as a matter of law meets the necessity and financial burden requirement. She points to language in Press v. Lucky Stores, Inc. (1983) 34 Cal.3d 311, 321, 193 Cal.Rptr. 900, 667 P.2d 704 (Press), a case in which we determined that a party that enforced a right to gather signatures for a statewide initiative petition in front of a supermarket was eligible for section 1021.5. fees. In considering the necessity and financial burden requirement, the Press court stated: "That plaintiffs' personal interests in the outcome of the oil profits initiative were sufficient to induce them to bring this action is irrelevant. As the statute makes clear, subdivision (b) of section 1021.5 focuses not on plaintiffs' abstract personal stake, but on the financial incentives and burdens related to bringing suit. Indeed, in the absence of some concrete personal interest in the issue being litigated, the putative plaintiff would lack standing to bring an action." (Press, supra, 34 Cal.3d at p. 321, fn. 11, 193 Cal.Rptr. 900, 667 P.2d 704.) Annette interprets this language as signifying that when a party has no pecuniary interest in the outcome of the litigation, it will automatically satisfy the necessity and financial burden requirement.
Sharon disagrees with this interpretation of Press, and points to several Court of Appeal cases holding that private, nonpecuniary interests of some kind can disqualify a party from eligibility for section 1021.5 attorney fees. (See Punsly v. Ho (2003) 105 Cal.App.4th 102, 113-114, 129 Cal.Rptr.2d 89; Hammond v. Agran (2002) 99 Cal.App.4th 115, 120 Cal.Rptr.2d 646 (Hammond); Williams v. San Francisco Bd. of Permit Appeals (1999) 74 Cal. App.4th 961, 970-971, 88 Cal.Rptr.2d 565; Families Unafraid to Uphold Rural El Dorado County v. Bd. of Supervisors (2000) 79 Cal.App.4th 505, 516, 94 Cal. Rptr.2d 205: but see Families Unafraid at pp. 527-528, 94 Cal.Rptr.2d 205 (dis. opn. of Sims, J.).)
Although Annette argues that nonpecuniary interests may not disqualify a party from eligibility for section 1021.5 attorney fees, her defense of her own attorney fee award does not depend on that proposition being categorically true. Rather, the trial court in the present case, while not ruling out that Annette's personal interest could render her ineligible for section 1021.5 fees, instead concluded that the cost of the litigation transcended those interests. Admitting the difficulty if not impossibility of estimating the monetary value of Annette's personal interests in her children, it observed that Annette's attorney, Charles Bird, offered to represent her because of the public significance of the litigation and the importance of second parent adoptions for families and children throughout California. It also noted that prior to Bird's entry in the case, Annette had produced only letter briefs that were inadequate for addressing the second parent adoption issue. The Court of Appeal, on the other hand, held, and Sharon now argues, that Bird's motivation is not relevant, and that *378 Annette's considerable personal interests in vindicating her parental rights disqualifies her from attorney fees.
We need not decide whether the trial court abused its discretion in holding that the costs of the present litigation transcended Annette's personal interests. As discussed below, we conclude that even if the trial court was within its discretion in so holding, section 1021.5 attorney fees may not be awarded in the present case for a different reason: Sharon is not the type of party on whom private attorney general fees were intended to be imposed.

B. Sharon's Litigation Is Not Within the Scope of Section 1021.5
Sharon contends that section 1021.5 attorney fees should not be imposed on parties such as herself, an individual who has only engaged in litigation to adjudicate private rights from which important appellate precedent happens to emerge, but has otherwise done nothing to compromise the rights of the public or a significant class of people. We agree.
In evaluating Sharon's claim, we are mindful that section 1021.5 is an exception to the general rule in California, commonly referred to as the American rule and codified in section 1021, that each party to a lawsuit must ordinarily pay his or her own attorney fees. (Trope v. Katz (1995) 11 Cal.4th 274, 278-279, .45 Cal. Rptr.2d 241, 902 P.2d 259.) In support of the American rule is the argument "that since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel." (Fleischmann Corp. v. Maier Brewing (1967) 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475.)
Although not explicit in either the statute or case law, it may be supposed that one unspoken justification for departing from the American rule in the case of section 1021.5 private attorney general fees is that it is equitable to impose public interest attorney fees on parties that have done something to adversely affect the public interest. Indeed, although no case has explicitly addressed the matter, our review of the case law reveals that in virtually every published case in which section 1021.5 attorney fees have been awarded, the party on whom the fees have been imposed had done something more than prosecute or defend a private lawsuit, but instead had engaged in conduct that in some way had adversely affected the public interest. In Woodland Hills, for example, the plaintiff was requesting attorney fees for successfully blocking the City of Los Angeles's unlawful approval of a subdivision. (Woodland Hills, supra, 23 Cal.3d at pp. 926-927, 154 Cal.Rptr. 503, 593 P.2d 200.) In Serrano v. Priest (1977) 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303, in which this court first endorsed the doctrine of private attorney general fees, the historic underlying litigation compelled the state to change its method of distributing school funding to comply with the equal protection clause of the state Constitution. In other words, in both these cases, public interest litigation obtained a substantial benefit by causing a change in the defendant's behavior, whose actions or failure to act was somehow impairing the statutory or constitutional rights of the public or a significant class of people. And so it is in the other published cases we have reviewed.[3]
*379 To determine whether there is in fact an implicit requirement that the party on whom attorney fees are imposed be responsible for adversely affecting the public interest, we first look first to the words of the statute, "`because they generally provide the most reliable indicator of legislative intent.'" (Murphy v. Kenneth Cole Productions, Inc. (2007) 40 Cal.4th 1094, 1103, 56 Cal.Rptr.3d 880, 155 P.3d 284.) Although the statute does not explicitly address the type of conduct that would make a party liable for attorney fees, it does suggest what conduct the Legislature had in mind. Section 1021.5 authorizes fees for "any action which has resulted in the enforcement of an important right affecting the public interest...." (Italics added.) The enforcement of an important right affecting the public interest implies that those on whom attorney fees are imposed *380 have acted, or failed to act, in such a way as to violate or compromise that right, thereby requiring its enforcement through litigation. It does not appear to encompass the award of attorney fees against an individual who has done nothing to curtail a public right other than raise an issue in the context of private litigation that results in important legal precedent.
We also find support for this interpretation in the legislative history. According to one legislative history document, "the purpose of [section 1021.5] is to provide statutory authority for an award of attorneys' fees in public interest litigation." (Sen. Com. on Judiciary, Rep. on Assem. Bill No. 1310 (1977-1978 Reg. Sess.) as amended (May 18, 1977) p. 1.) Testimony before the Senate Committee on the Judiciary on behalf of section 1021.5 affirmed that the statute would "effectuate the enforcement of laws enacted by the legislature of the state in the public interest." (Sen. Com. on Judiciary, Hearing on Assem. Bill No. 1310 (1977-1978 Reg. Sess.), testimony of John R. Phillips, p. 15 (Aug. 14, 1977).) As these passages suggest, the Legislature was focused on public interest litigation in the conventional sense: litigation designed to promote the public interest by enforcing laws that a governmental or private entity was violating, rather than private litigation that happened to establish an important precedent.
This conclusion is also consistent with our recent holding in Connerly v. State Personnel Bd. (2006) 37 Cal.4th 1169, 39 Cal.Rptr.3d 788, 129 P.3d 1. In refusing to impose section 1021.5 attorney fees on amici curiae that had unsuccessfully argued in favor of state affirmative action policies, we noted that "[generally speaking, the opposing party liable for attorney fees under section 1021.5 has been the defendant person or agency sued, which is responsible for initiating and maintaining actions or policies that are deemed harmful to the public interest and that gave rise to the litigation." (37 Cal.4th at pp. 1176-1177, 39 Cal.Rptr.3d 788, 129 P.3d 1, italics added.) We noted also that case law has recognized that attorney fees may sometimes be assessed against "real parties in interest that had a direct interest in the litigation, the furtherance of which was generally at least partly responsible for the policy or practice that gave rise to the litigation ...." (Id. at p. 1181, 39 Cal.Rptr.3d 788, 129 P.3d 1, italics added.) In concluding that the state rather than amici curiae should be assessed attorney's fees, we found critical that "the state, through its elected representatives, possessed the power, and indeed the exclusive power, to abandon or change the statutory scheme [challenged by the underlying litigation]. Because it declined to do so, the burden of paying ... attorney fees is properly imposed on the state, rather than on an amicus curiae...." (Id. at p. 1183, 39 Cal.Rptr.3d 788, 129 P.3d 1.) Thus, in Connerly we acknowledged that the parties against whom attorney fees should be assessed should be those responsible for the policy or practice adjudged to be harmful to the public interest.
This is not to say that a party cannot be held liable for section 1021.5 attorney fees for engaging in litigation. When a party initiates litigation that is determined to be detrimental to the public interest, attorney fees have been imposed. In Wal-Mart Real Estate Business Trust v. City Council of San Marcos (2005) 132 Cal.App.4th 614, 33 Cal.Rptr.3d 817, for example, Wal-Mart attacked on technical grounds a referendum that was to decide whether it could locate within the city, and the city was awarded attorney fees after it prevailed in the litigation. Wal-Mart thus sought a judgment that would adversely affect the public interest by preventing the *381 city's electorate from exercising its power of referendum. (See also Hull v. Rossi (1993) 13 Cal.App.4th 1763, 17 Cal.Rptr.2d 457 [§ 1021.5 fees awarded when a party successfully defended against litigation that would have restricted its ballot arguments for and against two local initiatives].) Moreover, attorney fees have been awarded to those defending against suits by public entities, or those purporting to represent the public, that seek to expand the government's power to curtail important public rights. (See County of San Luis Obispo v. Abalone Alliance (1986) 178 Cal.App.3d 848, 866-869, 223 Cal.Rptr. 846 [attorney fees awarded to defendant protesters when suit by county and private parties to compel protesters to pay for costs resulting from the protest would have chilled defendants' right to protest].)
In contrast, Sharon was a private litigant with no institutional interest in the litigation, and the judgment she sought in the present case would have settled only her private rights and those of her children and Annette. She simply raised an issue in the course of that litigation that gave rise to important appellate precedent decided adversely to her.[4]
Annette suggests that a requirement that an individual liable for private attorney general fees must have done something to compromise the rights of the public is inconsistent with the well-established principle that a showing of bad faith is not necessary for an award of section 1021.5 fees. (See, e.g., Citizens Against Rent Control v. City of Berkeley, supra, 181 Cal.App.3d at p. 231, 226 Cal.Rptr. 265.) Not so. We impose no such bad faith requirement, but hold only, consistent with the language and evident intent of the statute, that the party against whom such fees are awarded must have done or failed to do something, in good faith or not, that compromised public rights. Nor do we deny that in some cases the litigation underlying the section 1021.5 award can involve rights or benefits that are somewhat intangible, such as clarifying important constitutional principles. But even in such cases, the party against whom the fees are awarded is responsible in some way for the violation of those rights and principles. (See, e.g., Harbor v. Deukmejian, supra, 43 Cal.3d at p. 1103, 240 Cal.Rptr. 569, 742 P.2d 1290 [enforcing limitations on Governor's veto power].) Nor does the proposed holding in any way contradict the incontrovertible proposition that section 1021.5 fees may be sought in the appropriate case not only against governmental entities and corporations but against private individuals. (See, e.g., Planned. Parenthood, Inc. v. Aakhus, supra, 14 Cal.App.4th 162, 17 *382 Cal.Rptr.2d 510 [anti-abortion protestors violating privacy rights of clinic patrons assessed § 1021.5 fees].)
Of course, whether litigation generates important appellate precedent is a factor courts may consider in determining whether the litigation can be said to enforce an important right affecting the public interest. (See Los Angeles Police Protective League, supra, 188 Cal.App.3d at p. 12, 232 Cal.Rptr. 697.) But even when an important right has been vindicated and a substantial public benefit conferred, and when a plaintiffs litigation has transcended her personal interest, we conclude that section 1021.5 was not intended to impose fees on an individual seeking a judgment that determines only his or her private rights, but who has done nothing to adversely affect the public interest other than being on the losing side of an important appellate case. Because Sharon fits squarely into this category, we affirm the Court of Appeal's judgment reversing the trial court's attorney fee award.[5]

III. DISPOSITION
The judgment of the Court of Appeal is affirmed.
WE CONCUR: GEORGE, C.J., KENNARD, BAXTER, WERDEGAR, CHIN and CORRIGAN, JJ.
NOTES
[1] All statutory citations are to this code unless otherwise indicated.
[2] Section 1021.5 provides in pertinent part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."
[3] (See, e.g., Harbor v. Deukmejian (1987) 43 Cal.3d 1078, 1083, 240 Cal.Rptr. 569, 742 P.2d 1290 [Governor's veto of a part of a nonappropriations bill is unconstitutional]; Saleeby v. State Bar (1985) 39 Cal.3d 547, 568, 216 Cal.Rptr. 367, 702 P.2d 525 [State Bar failed to provide adequate procedures for individuals making claims on the Client Security Fund (Bus. & Prof.Code, § 6140.5)]; People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach (1984) 36 Cal.3d 591, 602, 205 Cal.Rptr. 794, 685 P.2d 1145 [city council proposed amendments in violation of "meet and confer" requirement under Gov.Code. § 3505]; Folsom v. Butte County Assn. of Governments (1982) 32 Cal.3d 668, 671-673, 186 Cal.Rptr. 589, 652 P.2d 437 [county failed to use transportation funds to create public transit systems required by the Transportation Development Act of 1971]; Colgan v. Leatherman Tool Group, Inc. (2006) 135 Cal.App.4th 663, 682-683, 38 Cal.Rptr.3d 36 [corporation labeled products in violation of false advertising law]; Krumme v. Mercury Ins. Co. (2004) 123 Cal.App.4th 924, 945, 20 Cal.Rptr.3d 485 [corporation utilized insurance brokers in violation of statutory requirements]; Edgerton v. State Personnel Bd. (2000) 83 Cal.App.4th 1350, 1359-1363, 100 Cal. Rptr.2d 491 [state department discharge of employee for positive drug test violated federal regulations]; Friends of the Trails v. Blasius (2000) 78 Cal.App.4th 810, 825-826, 93 Cal.Rptr.2d 193 [landowner retained control over use of a road after the public acquired an easement]; Notrica v. State Comp. Ins. Fund (1999) 70 Cal.App.4th 911, 927-928, 83 Cal.Rptr.2d 89 [quasi-public agency implemented insurance claim reserve practices resulting in plaintiff paying higher insurance premiums and receiving lower dividends, in violation of the implied covenant of good faith]; County of San Diego v. Lamb (1998) 63 Cal.App.4th 845, 851, 73 Cal.Rptr.2d 912 [county improperly required the defendant to reimburse funds received from the Aid to Families with Dependent Children program]; City of Fresno v. Press Communications, Inc. (1994) 31 Cal.App.4th 32, 43-44, 36 Cal. Rptr.2d 456 [city enacted an ordinance prohibiting the distribution of advertisements in violation of the First Amendment]; Planned Parenthood, Inc. v. Aakhus (1993) 14 Cal. App.4th 162, 169-175, 17 Cal.Rptr.2d 510 [antiabortion protestors engaged in conduct in violation of plaintiff's constitutional right to privacy]; Beasley v. Wells Fargo Bank (1991) 235 Cal.App.3d 1407, 1412, 1 Cal.Rptr.2d 459 [bank improperly assessed fees against credit card customers who failed to make timely payments or exceeded their credit card limits]; Sokolow v. County of San Mateo (1989) 213 Cal.App.3d 231, 240, 261 Cal.Rptr. 520 [mounted patrol engaged in sex discrimination in violation of federal and state law]; Los Angeles Police Protective League, supra, 188 Cal.App.3d 1, 6, 232 Cal.Rptr. 697 [city improperly disregarded a ruling of its administrative board]; Citizens Against Rent Control v. City of Berkeley (1986) 181 Cal.App.3d 213, 221, 226 Cal.Rptr. 265 [city enacted an ordinance limiting contribution to campaign committees in violation of the First Amendment]; Kern River Public Access Com. v. City of Bakersfield (1985) 170 Cal.App.3d 1205, 1225, 217 Cal.Rptr. 125 [city approved subdivision maps in violation of statute]; Slayton v. Pomona Unified School Dist. (1984) 161 Cal. App.3d 538, 541, 207 Cal.Rptr. 705 [school district engaged in conduct in violation of plaintiffs' rights under California statute, state, and federal Constitutions]; Schmid v. Lovette (1984) 154 Cal.App.3d 466, 472-473, 201 Cal.Rptr. 424 [school district required employees to give oath in violation of plaintiff's rights under state and federal Constitutions]; Daniels v. McKinney (1983) 146 Cal. App.3d 42, 48-49, 193 Cal.Rptr. 842 [sheriff failed to comply with a court order requiring him to provide three hours of exercise time per week to female inmates].)
[4] The one case that arguably deviates from this rule is Hammond, supra, 99 Cal.App.4th 115, 120 Cal.Rptr.2d 646. There, Agran's candidate statement for city council was challenged by Hammond, a political rival, partly because the statement was allegedly misleading, and partly because the statement articulating Agran's opposition to building an airport was supposedly inconsistent with Elections Code section 13307, providing that candidate statements speak of the qualifications of the candidate. Hammond argued that Agran's views about the airport were not "qualifications." The court held that Agran could get attorney fees against Hammond for his successful litigation establishing that the candidate's statement authorized by section 13307 could include candidates' views of the issues, although it also held that Agran could not obtain attorney fees for litigation involving whether or not the statement was misleading, an issue that did not transcend Agran's personal interest. (Hammond, supra, al pp. 129, 132-135, 120 Cal.Rptr.2d 646.)

Hammond is distinguishable insofar as election law litigation inherently implicates public rights. We need not decide whether Hammond is correct that a suit between political rivals that results in significant election law precedent may give rise to section 1021.5 fees.
[5] In light of our disposition of the case, we need not address the constitutional and other issues raised by Sharon.