[No. G046048. Fourth Dist., Div. Three. June 21, 2012.]

AZURE LIMITED, Plaintiff and Appellant, v.
I-FLOW CORPORATION, Defendant and Respondent.

COUNSEL

Shapiro, Rodarte & Forman, Carl W. Shapiro, Thomas W. Foote, Jeffrey A. Kiburtz and Benjamin A. Shapiro for Plaintiff and Appellant.

King & Spalding, Timothy T. Scott, Leo Spooner III, Ashley C. Parrish and Daniel S. Epps for Defendant and Respondent.

OPINION

**IKOLA, J.**—Plaintiff Azure Limited (Azure) appeals the trial court's denial of its pre- and postjudgment motions for attorney fees pursuant to Code of Civil Procedure section 1021.5.[1] We affirm. In essence, this was a private dispute between two corporate parties over hundreds of thousands of dollars in economic losses. Because the resolution of the case happened to turn in part on the interpretation of the Unclaimed Property Law (UPL) (§ 1500 et seq.), Azure's tenacious pursuit of its interests resulted in a Supreme Court opinion bearing on the rights of all property owners whose property has been wrongfully transferred to the state by another private party. (See *Azure Limited v. I-Flow Corp.* (2009) 46 Cal.4th 1323 [96 Cal.Rptr.3d 501, 210 P.3d 1110] (*Azure I*).) But merely advancing the state of the law does not transform a private dispute over substantial economic losses into a section 1021.5 case in which fees may be awarded to attorneys for serving the public interest as private attorneys general. Defendant I-Flow Corporation (I-Flow) "has done nothing to curtail a public right other than raise an issue [involving a public right] in the context of private litigation that results in important legal precedent." (*Adoption of Joshua S.* (2008) 42 Cal.4th 945, 956 [70 Cal.Rptr.3d 372, 174 P.3d 192] (*Joshua*).)

FACTS

*Initial Complaint and Appellate Proceedings*

We quote liberally from the *Azure I* opinion for factual information about the initial stages of this litigation. Azure sued I-Flow "for breach of fiduciary

---

[1] All statutory references are to the Code of Civil Procedure.

duty. The complaint alleged the following: Azure acquired nearly 95,000 shares of I-Flow stock in 1990 and exchanged those shares in 1993 for nearly 19,000 shares in a reverse stock split. In 2003, Azure learned that I-Flow had transferred these shares to the state as escheated property. In October 2003, Azure requested the state to return its stock. The state responded that Azure might not be able to receive the stock itself, and that it might instead receive proceeds from the sale of the stock. In November 2004, when I-Flow's common stock was selling for $17.72 per share, Azure learned that the state had sold the stock in June 2003 for $4.62 per share." (*Azure I, supra,* 46 Cal.4th at p. 1327.)

"The complaint alleged that I-Flow breached its fiduciary duty to Azure by treating Azure's stock as abandoned property even though it knew Azure's location at all relevant times, by transferring the stock to the state without legal justification, and by failing to give Azure notice of the transfer. It sought to recover as damages the difference between the proceeds from the June 2003 sale and the value of the stock as of November 2004." (*Azure I, supra,* 46 Cal.4th at pp. 1327–1328.)

"The superior court granted judgment on the pleadings in favor of I-Flow, finding that section 1532 immunized I-Flow's actions, and entered judgment accordingly. Azure appealed. The Court of Appeal reversed the judgment. It held that the 'UPL immunizes corporations from civil liability only when they transfer escheated shares to the state in compliance with the provisions of the UPL. The UPL does not immunize corporations like [I-Flow] who allegedly transfer nonescheated shares to the state without giving the required notice.' " (*Azure I, supra,* 46 Cal.4th at p. 1328.) The Supreme Court granted review of this court's previously published opinion to resolve a conflict between our opinion and *Harris v. Verizon Communications* (2006) 141 Cal.App.4th 573 [46 Cal.Rptr.3d 185], which was relied upon by I-Flow in its motion for judgment on the pleadings and in its appellate proceedings. (*Azure I,* at pp. 1327–1328, 1333.)

Azure's position was vindicated by the Supreme Court on July 16, 2009, in *Azure I:* "We conclude that a corporation is entitled to section 1532's immunity only if it complies with other provisions of the UPL." (*Azure I, supra,* 46 Cal.4th at p. 1327.) The judgment of this court was affirmed (*id.* at p. 1336) and, accordingly, the matter was remanded to the trial court "with directions to vacate [the] order granting judgment on the pleadings and instead to deny the motion" (*id.* at p. 1328).

*Proceedings Following Remand*

Nearly two years passed between the *Azure I* opinion and the settlement of the merits of this lawsuit. I-Flow aggressively litigated the case by, among other things, (1) filing a second motion for judgment on the pleadings (which resulted in Azure voluntarily amending its complaint); (2) filing two successive demurrers to Azure's amended complaints; (3) filing a cross-complaint for indemnity against Azure; and (4) making repeated attempts to compel Azure representatives to appear in California for depositions.

Azure alleged in its operative complaint that it suffered actual damages of at least $239,641.76 as a result of I-Flow's tortious conduct. Azure's prayer for relief requested general and special damages, costs of suit including attorney fees to the extent permitted by law, statutory interest, and punitive damages.

*Stipulated Entry of Judgment*

On June 27, 2011, the parties filed a stipulation for entry of judgment. The stipulation indicated the parties had entered into a separate settlement agreement and release "designed to resolve Azure's claims against I-Flow in this action." The settlement agreement included a provision requiring I-Flow to pay Azure $350,000 within 10 days of execution of the agreement.[2] Pursuant to the stipulated judgment, Azure retained the right both to pursue a postjudgment motion for attorney fees pursuant to section 1021.5 and to appeal the court's pre- and postjudgment rulings pertaining to the issue of attorney fees.

*Court's Rulings on Attorney Fee Motions*

Azure filed several motions for attorney fees pursuant to section 1021.5. These motions were filed both before and after settlement of the case occurred.

The court denied Azure's initial motion for attorney fees: "[Azure] has not shown that it has obtained a ruling that is of significant benefit to the public or a large class of persons, i.e., that a significant portion of the public will be affected by the Supreme Court ruling in this case. [Citation.] It does not matter how much property has been subject to escheat in recent years; there is no showing of how much of that property has been wrongfully escheated due to improper notice. [¶] In addition, the financial burden is not such as to justify the award. There is evidence that Plaintiff is motivated primarily by its own financial interests, and that benefit to the public is only coincidental."

---

[2] According to Azure's brief, this amount represents "its lost appreciation plus interest."

The court also denied Azure's postjudgment motion for attorney fees: "This is an improper motion for reconsideration, with no new facts or law. [(§ 1008, subd. (e).)] Instead, [Azure] argues extensively that the court's prior ruling was erroneous. . . . In addition, [Azure] admits that it added a claim for punitive damages to the complaint. Such a claim cannot be alleged without a good faith belief that it has some merit. [(§ 128.7, subd. (b).)] Thus, there was private financial incentive to continue litigating."[3]

## DISCUSSION

Ordinarily, we review a denial of attorney fees under section 1021.5 for an abuse of discretion. But because our resolution of this appeal turns on the application of legal principles rather than factual findings or the exercise of discretion, our review is de novo. (See *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213 [117 Cal.Rptr.3d 342, 241 P.3d 840].)

■ "[S]ection 1021.5 is an exception to the general rule in California, commonly referred to as the American rule and codified in section 1021, that each party to a lawsuit must ordinarily pay his or her own attorney fees." (*Joshua, supra*, 42 Cal.4th at p. 954.) ■ "[E]ligibility for section 1021.5 attorney fees is established when '(1) plaintiffs' action "has resulted in the enforcement of an important right affecting the public interest," (2) "a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons" and (3) "the necessity and financial burden of private enforcement are such as to make the award appropriate." ' " (*Conservatorship of Whitley, supra*, 50 Cal.4th at p. 1214.)[4]

In *Joshua, supra*, 42 Cal.4th 945, our Supreme Court identified an additional restriction on the scope of section 1021.5: Even assuming the three section 1021.5 factors identified above can be satisfied, there is also "an implicit requirement that the party on whom attorney fees are imposed be responsible for adversely affecting the public interest . . . ." (*Joshua*, at

---

[3] In its brief, I-Flow ignores the court's ruling that the postjudgment motion was an improper motion for reconsideration. We do so as well. This appeal is timely regardless of whether Azure is appealing from the judgment or the postjudgment order denying attorney fees. We therefore address the merits of the appeal without sorting through whether Azure violated section 1008.

[4] The text of section 1021.5 states, in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

p. 955.) "[S]ection 1021.5 does not authorize an award of attorney fees against an individual who has done nothing to adversely affect the rights of the public or a substantial class of people other than raise an issue in the course of private litigation that could establish legal precedent adverse to a portion of the public . . . ." (*Id.* at p. 949.)

■ Before arriving at this interpretation of section 1021.5, our Supreme Court considered both statutory text and legislative purpose. The language of section 1021.5 "implies that those on whom attorney fees are imposed have acted, or failed to act, in such a way as to violate or compromise [an important right affecting the public interest], thereby requiring its enforcement through litigation. [Section 1021.5] does not appear to encompass the award of attorney fees against an individual who has done nothing to curtail a public right other than raise an issue in the context of private litigation that results in important legal precedent." (*Joshua, supra,* 42 Cal.4th at p. 956.) "Although not explicit in either the statute or case law, it may be supposed that one unspoken justification for departing from the American rule in the case of section 1021.5 private attorney general fees is that it is equitable to impose public interest attorney fees on parties that have done something to adversely affect the public interest." (*Id.* at p. 954.) In enacting section 1021.5, "the Legislature was focused on public interest litigation in the conventional sense: litigation designed to promote the public interest by enforcing laws that a governmental or private entity was violating, rather than private litigation that happened to establish an important precedent." (*Joshua,* at p. 956.)

Having interpreted the statute, the court then applied section 1021.5 to the case before it. Annette (an adoptive mother) and Sharon (the child's biological mother and Annette's former romantic partner) engaged in litigation resulting in a California Supreme Court opinion holding that "second parent adoptions like that sought by [Annette] were lawful." (*Joshua, supra,* 42 Cal.4th at pp. 949–950.) On remand, Annette moved for an award of section 1021.5 attorney fees from Sharon based on the appellate litigation leading to the published opinion. (*Joshua,* at pp. 949–950.) Affirming the Court of Appeal, the Supreme Court held that the trial court wrongly awarded section 1021.5 attorney fees against Sharon. ". . . Sharon was a private litigant with no institutional interest in the litigation, and the judgment she sought in the present case would have settled only her private rights and those of her children and Annette. She simply raised an issue in the course of that litigation that gave rise to important appellate precedent decided adversely to her." (*Joshua,* at p. 957.)

In light of *Joshua*, we conclude I-Flow "is not the type of party on whom private attorney general fees were intended to be imposed." (*Joshua, supra*, 42 Cal.4th at p. 953; see *Wilson v. San Luis Obispo County Democratic Central Com.* (2011) 192 Cal.App.4th 918, 924–925 [121 Cal.Rptr.3d 731].) In defending a lawsuit brought by Azure for damages, I-Flow raised a defense of statutory immunity. Ultimately, the California Supreme Court rejected I-Flow's position in a published opinion. But I-Flow did nothing else that could affect the rights of the public or a substantial number of people. There is no indication in the record that I-Flow wrongly transferred other sharehold-ers' property to the state or had any intention of doing so in the future. No injunctive relief was provided against I-Flow, and there is no indication in the record that such relief would have been appropriate or necessary. I-Flow has no institutional interest in the litigation; it simply wished to avoid liability for the economic losses of Azure which were caused by I-Flow's actions in the past. This was a standard zero sum game, backward-looking case in which two private parties fought over who would be left holding the bag for losses that had already occurred. This is not a case in which Azure volunteered to take on a party who was adversely affecting the *public* interest.

A recent Supreme Court case found *Joshua* to be inapplicable to the facts presented therein. (*Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1021 [132 Cal.Rptr.3d 358, 262 P.3d 568] (*Serrano*).) In *Serrano*, the plaintiffs (who did not notice the deposition) disputed the fee a court reporter sought to charge to *each* party for expediting a deposition transcript. (*Id.* at pp. 1020–1022.) The dispute produced a published Court of Appeal opinion, which held that trial courts have inherent authority to review the reasonableness of fees charged by court reporters, at least with regard to the nonnoticing party (who did not enter into a contractual arrangement with the reporter). (*Id.* at pp. 1022–1023.) On remand, the court ruled that the entire expedited fee amount was unreasonable and ordered the fee returned to the nonnoticing party. (*Id.* at p. 1024.) The prevailing party then moved for attorney fees under section 1021.5, which the trial court denied under *Joshua, supra*, 42 Cal.4th 945. (*Serrano*, at pp. 1024–1025.)

The Court of Appeal affirmed (*Serrano, supra*, 52 Cal.4th at p. 1025), but our Supreme Court reversed: "Deposition reporters are officers of the court, regulated by statute, who perform a public service of considerable importance to litigants and members of the public. The reporting service here did not merely seek to vindicate its private rights. It defended its institutional interest in controlling the fees it charges, and sought to shield itself from judicial review of its conduct as a ministerial officer of the court. Moreover, it was found to have charged plaintiffs an unreasonable fee. The courts below erred

by concluding that the service did nothing adverse to the public interest, and that plaintiffs' appeal did not involve an important right affecting the public interest" (*id.* at p. 1021). *Serrano* was not merely a private business dispute, as "[t]here was no business relationship between plaintiffs and [the court reporter]. Plaintiffs had no choice but to get their transcripts from [the court reporter]. [The court reporter] was a ministerial officer of the court, and its obligations to plaintiffs were determined by statute, not by contract." (*Id.* at p. 1027.)

■ *Serrano* does not change our view of the instant case. I-Flow did not have an institutional interest in establishing the right to immunity under the UPL; it merely sought to avoid paying significant damages (hundreds of thousands of dollars) in this particular case. Conversely, the court reporter in *Serrano* doggedly fought not for the hundreds of dollars at issue, but rather for its institutional interest—the right to charge fees to deposition participants without court review of the reasonableness of such fees. Moreover, I-Flow was not an officer of the court or a quasi-public agent in any sense. Instead, it appears that I-Flow did not comply with the UPL with regard to Azure's rights. But a single statutory violation by a private party vis-à-vis a single victim (and ensuing litigation over substantial economic damages arguably arising from that single violation) does not adversely affect the public interest, even if the defense of the case could potentially result in a published opinion adverse to the interests of a substantial class of people.

■ Azure's discussion of the heavy financial cost of bringing this case is irrelevant to the question of whether I-Flow was adversely affecting the public interest. With regard to the high cost of appealing the initial grant of judgment on the pleadings by the trial court, I-Flow should not be held to account for uncertainty in the state of the law before *Azure I*. And with regard to alleged "scorched earth" litigation tactics by I-Flow following *Azure I*, such tactics do not provide an independent basis for converting a non-section 1021.5 case into a section 1021.5 case. There are specific provisions of the Code of Civil Procedure applicable to allegations of bad faith litigation practices. (See, e.g., § 128.7 [availability of sanctions for bad faith pleadings and motions]; § 2019.030, subd. (c) [monetary sanctions may be imposed on party making or opposing motion for protective order].) A party seeking compensation based solely on abusive litigation tactics must look to these provisions or to abuse of process torts, whatever the practical limitations of these strategies.

Because we affirm on the grounds set forth above, we need not address the trial court's various rationales for denying attorney fees under section 1021.5.

## DISPOSITION

The judgment and the postjudgment order denying attorney fees are affirmed. Defendant I-Flow shall recover costs incurred on appeal.

Bedsworth, Acting P. J., and Fybel, J., concurred.

A petition for a rehearing was denied July 18, 2012, and appellant's petition for review by the Supreme Court was denied September 26, 2012, S204342.