Filed 2/27/13  Adoption of Samatha P. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| ADOPTION OF SAMANTHA  P., a Minor. | B232600 |
| IRENE M., | (Los Angeles County Super. Ct. No. GT000441) |
| Plaintiff and Appellant, | |
| v. | |
| SCOTT P. et al., | |
| Defendants and Respondents. | |
| NICHOLAS C., | |
| Real Party in Interest. | |

APPEAL from an order of the Superior Court of Los Angeles County,

Joseph F. De Vanon, Judge.  Order affirmed.

The Nair Law Group and Gouri G. Nair for Plaintiff and Appellant.

Christopher Blake for Real Parties in Interest, Samantha P., et al.

Darlene Azevedo Kelly, under appointment by the Court of Appeal, for Minor.

Irene M. appeals from the trial court's order denying her motion to enforce a "visitation" clause in a contact after adoption agreement entered into pursuant to Family Code section 8616.5.  We affirm the trial court's order.

## FACTUAL AND PROCEDURAL HISTORY

1.      *Background Facts*

In 2003, petitioner, Irene M., became the foster parent, with the possibility of adoption, of two-and-one-half year old Nicholas C. and his two-and-one-half month old sister, Samantha.  Irene M. was assisted in the care of these children by her daughter, 19-year-old Crystal C., and adopted them on August 23, 2003.   However in 2005, Irene M. began to have persistent health problems.  She was diagnosed with Guillen-Barre Syndrome and spent much of 2005 in the hospital.  Family friends, Scott and Glori P., took over the care of Samantha and, in 2006, they adopted her.   At the same time, Scott and Glori P. and Irene M. executed a post-adoption contact agreement (ADOPT-310) pursuant to Family Code section 8616.5 in which the three agreed that Nicholas and Samantha would maintain contact by telephone, mail, the opportunity to share information, e-mail, visits and "other" means.  The agreement was signed by Glori P., Scott P., Irene M., their lawyer, Michael L. Oddenino and, on March 17, 2006, Judge Joseph F. De Vanon of the Pasadena Superior Court.[1]

---

[1]      The agreement reads in part:  "Irene [M.], Nicholas C. [M.'s] adoptive mother, agrees to facilitate contact through the  means of telephone, letter, share information, e-mail, and visits, between Nicholas [M.] and Samantha [P.], natural brother and sister, on a regular basis to maintain and develop their all ready [*sic*] established relationship. Scott and Glori [P.] agree to reciprocate the efforts of contact between Nicholas and

2

After Samantha's adoption, she and her brother, Nicholas, kept in contact by means of the telephone, internet, Skype and visits. They communicated with each other between two and five times each week. Until July of 2009, Scott and Glori P. lived in Whittier while Irene M. lived in San Gabriel. Under those circumstances, physical visitation was relatively easy to arrange and "Samantha and Nicholas grew up knowing each other as brother and sister." Then, in March of 2009, the P.s were forced to close their business and, after months of looking for employment, Scott P. was offered a position in Missouri. In July of 2009 Scott accepted the job and the family moved to a suburb of St. Louis.

According to Scott P., "[s]ince moving to Missouri, both [he and Glori P.] have encouraged Samantha to stay in contact with Nicholas. However, the truth of the matter is that it does not take a tremendous amount of encouragement on [the P.'s] part . . . . On their own[,] the children . . . typically communicate with each other electronically at least 2 times per week" by means of Skype, telephone or e-mail. Irene M. and Crystal C. do not dispute this, but assert that Scott and Glori have begun to improperly monitor the phone calls and electronic communications and note that Samantha and Nicholas have not had any physical contact since 2009.

---

Samantha, also through the means of telephone, letter, share information, e-mail and visits." The agreement does not specify how often, where or how "visits" are to occur.

2. *The Mediations*

The monitoring of the electronic communications and the lack of physical contact "led to tension" between Irene M. and Crystal C. and Scott and Glori P.[2] This led Irene M. and Crystal C. to seek mediation pursuant to Family Code section 8616.5, subdivision (e)(3).)[3] Irene M. and Crystal C. hoped that, through mediation, arrangements could be made for visits between the children.[4] The two mediations, however, proved unsuccessful. On February 22, 2011, the mediator reported that "[d]espite good faith attempts on both sides, the parties were unable to solve their

---

[2] In addition, after the adoption of Samantha, Irene M. and Crystal C. had a falling out with Scott and Glori P. Each accused the other of having adulterous relationships and Scott P. indicated he believed Irene M. had become "controlling," "belligerent" and "insulting" and led a lifestyle that he and Glori P. found "offensive." In his declaration, Scott P. stated that it had been his experience that Ms. M. felt " 'no reluctance to voice her anger about [the P.'s], in the form of name calling and derogatory insults, in the presence of Samantha . . . . [Scott P. believed] [t]his behavior [was] unacceptable and [was] not something that [he and Mrs. P.] wish[ed] to have inflicted upon [their] daughter. . . . ' " Finally, Scott P. did not wish to have Samantha exposed to what he believed was Ms. M.'s immoral lifestyle. He indicated that he believed she was the mistress of a married man and "use[d] threats of informing this man's wife . . . in order to get ongoing support from [him]."

[3] That subdivision of section 8616.5 provides: "A court will not act on a petition to change or enforce this agreement unless the petitioner has participated, or attempted to participate, in good faith in mediation, or other appropriate dispute resolution proceedings to resolve the dispute."

[4] In her Request to: Enforce, Change, End Contact After Adoption Agreement, Irene M. indicated that she "would like specific orders for visitation that [would] prevent further discord and assure the children of frequent and consistent contact." She then attached a proposed visitation schedule under which Samantha would spend three to four weeks each summer and every other Christmas in California.

4

disagreements. Both sides understand that this leaves the resolution of their [visitation] problem to the court."[5]

3.     *The Hearing Before the Trial Court*

A hearing was held before Judge Joseph F. De Vanon on February 24, 2011. There, counsel for Irene M. indicated that his client had attempted to resolve the problem of visitation through mediation. In addition, she had submitted to the court "a plan that was proposed to the other party, which would involve . . . Samantha coming [to San Gabriel] at [Irene M.'s] expense . . . and in fact [Irene M.] would be willing to fly to Missouri to pick [Samantha] up so that she would be accompanied" while traveling. Counsel stated that he believed "[t]he only contact [the children] ha[d] [had was] by phone, and [that it had] been minimal because the other party ha[d] been monitoring it and ha[d] been cutting it off at certain points. . . . So, . . . it's essentially almost no contact. And this is having a very deleterious effect on Nicholas[,] that he is not able to communicate freely with his sister."

Counsel for Scott and Gloria P. disagreed with Irene M.'s counsel's perception of the situation. Counsel referred to Scott P.'s declaration and indicated that there had been "extensive contact continuing between the children." Counsel indicted that he was satisfied with the level of contact that was "actually going on[.]"

The trial court indicated that "[t]he biggest issue [it had was] whether or not the brother and sister [were] able to talk." Counsel for Scott and Glori P. responded:

---

[5]     Subdivision (f) of Family Code section 8616.5 indicates that "[e]nforcement of [a] postadoption contact agreement shall be under the continuing jurisdiction of the court granting the petition of adoption."

"[During] [e]very discussion . . . I have had with my client[s], they have [indicated] every desire to continue the ongoing contact between Samantha and Nicholas. [¶] What they don't want to do is acquiesce [to] the unreasonable demands of [Irene M.], that they put their minor child on a plane unaccompanied, and send her out [to California] for a month, unsupervised with two women [that] they . . . disagree with [regarding] the way they raise[d] the[ir] child, the environment they are going to put [their] child in, and [believing that Irene and Crystal were] going to bad mouth and insult [them]. That's [their] primary objection. They have no objection to continuing the contact after adoption agreement. [¶] They have no objection to continuing phone contact [and] e-mail contact [and that] [t]he children play internet games together." In addition, Scott and Glori P. are "absolutely agreeable" to having Nicholas visit Samantha at their home in Missouri. Counsel continued, "[Irene and Crystal] are demanding that Samantha come out to them for a month, but they are unwilling to send Nicholas out [to Missouri] for a month. If it's unreasonable to send Nick, it is clearly unreasonable to send Samantha, who is three years younger. . . . This court cannot act to enforce the agreement unless there is evidence before [it] that this is in the best interests of Samantha. [¶] [Irene M. and Crystal C.] haven't even averred that. [They] haven't even alleged it. They have said [it is] [a]ffecting Nicholas." Counsel then noted, "My clients' opinions of [Irene M. and Crystal C.] is very low. I doubt that Nicholas is suffering as badly as they say [and] he is having contact routinely."[6]

---

[6]     Counsel then argued that he did not think Irene M. had standing to bring the petition. Counsel stated, "There is nothing in this Contact After Adoption Agreement

6

Irene M.'s counsel argued that the facts were being "misstated." He indicated that Irene M. was "willing to fly out to pick up [Samantha] and bring [her] back for the visit." Counsel continued, "We are willing to have exchanges at Christmas for both children[,] to alternate between the residences. [¶] These children did grow up together. . . . They attended each other's birthday parties [and] other functions. There was a long standing relationship [between] Samantha . . . and [both Irene M. and Crystal C.] [¶] . . . There is a strong bond there . . . . [A]nd [it is obvious it] is in the best interests of Samantha to be able to come out [and] spend time with people she grew up with [as well as] her brother."

When the trial court indicated that counsel for Scott and Glori P. had "indicate[d] that [they were] agreeable to hav[ing] Nicholas come back [to Missouri to] visit his sister[,]" counsel responded, "At this point Nicholas has expressed his uncomfortable position with that, until he has some time."

After further discussion, the trial court stated, "Here is the practical matter. I think I told everybody this from day one. I am not going to require any parent to put their minor child on an airplane, and have them fly cross country to visit with anybody else, no matter how nice that might be for any number of reasons. [¶] So, am I going to order that [Scott and Glori P.] have to put Samantha on the plane and fly her out here, or have someone fly her out? I am not going to. They are the parents. They get to determine what is the best home for their child . . . . [¶] They believe it is not in

_____

that gives Miss [M.] any interest in Samantha. It's Nicholas. I see no guardian ad litem indication that she has been appointed on behalf of Nicholas."

the . . . home and care [of Irene M]. I am not saying that's necessarily right. The [M.'s] appear to be fine people, but the [P.'s] have a right to determine where their child is going to reside and stay . . . . [¶] . . . And I think, to be honest with you, I think this is more about [Irene M.'s and Crystal C.'s] and [Scott and Glori P.'s] not liking each other, disapproving of each other . . . rather than putting the children's concerns and interests first, everybody is worried about winning . . . . [¶] I want these children to be able to have contact, non-monitored contact, so they can talk about whatever they want to talk about, even if it's their parents are driving them nuts, because that's the right of a young kid to share . . . with his brother or sister. . . . [¶] I think it would be a huge tragedy if these children are not able to get together and visit . . . . But I am not going to mandate that either set of parents has to put the child on a plane and fly them out. [¶] I will tell you this. If you don't find a way to work that out[,] [i]f somebody doesn't find a way to give up some ground on this, . . . the one thing [these children] are going to have in common is the anger they have at their parents . . . . "

The court concluded that, "[t]he only thing [it would] do with the petition [was] to reiterate the previous finding that the children should have access via mail, internet and telephone as often, and whenever they want to have it, [and] that access [was to] be done in an unmonitored manner. [¶] [In addition] the parents on both sides . . . [were to] continue to try to work on a situation wherein an agreeable visitation process [could] be arranged between Nicholas and Samantha. And if folks can't come to an agreement, then it will wait until [Nicholas and Samantha] are 18." The court continued, "At any rate, that's the order. If . . . [Scott and Glori P.] return to California, which does not

8

appear to be the case, since the employment situation changed, if [they do] return, then the court would reserve the right to revisit the issue of the visitation. [¶] But as long as [Scott P.] is out of state, I am not going to make any minor child fly anywhere. [¶] . . . [T]he petition [is] denied."[7]

On April 18, 2011, Irene M. filed a notice of appeal from the trial court's order denying her motion to enforce the "visitation" provision of the after adoption contact agreement.

## DISCUSSION[8]

1.    *Irene M's Standing*

There was, apparently, some question as to whether Irene M. had standing to bring the underlying action. Here, Irene M., as Nicholas M.'s adoptive mother, is

---

[7]    In the minute order entered on February 24, 2011, the trial court indicated: "In the matter of the petition of Irene [M.], case GT000441. The court rules as follows: [¶] Ms. [M.] is without standing to bring this petition. The court reiterates its previous order that the parties are to use their best efforts to facilitate contact between the siblings Nicholas and Samantha. [¶] In light of the fact that the families are some 2000 miles apart, both siblings are to have non monitored contact via telephone, e-mail, letters, and Skype. Both families are ordered to use best efforts to arrange personal visits between the siblings during normal hours. [¶] The court declines to order either family to require their child [to] fly cross country in order to visit. Petitioner to pay costs of mediation. Respondents' request for attorney fees is denied in light of petitioner paying all of the mediation costs."

[8]    Irene M., as the petitioner and appellant, and Nicholas M. and Samantha P., as real parties in interest, filed briefs in this matter. Respondents, Scott and Glori P., did not file a brief, but instead chose to submit the matter on the record.

In his brief, Nicholas M. asserted that the trial court erred by failing to appoint counsel for each of the children. As the issue was not brought or considered in the trial court, we need not consider it here. In any event, the error, if one occurred, was harmless. There is nothing in the record to indicate that, had such counsel been appointed, the result of the proceedings would have been different. (See *College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.)

9

a party to a post adoptive contact agreement made with Samantha P.'s adoptive parents, Scott and Glori P. "Agreements that provide for . . . [relatives, such as siblings] to continue visitation with [their brothers and sisters] following termination of parental rights or adoption are . . . recognized by statute and enforceable . . . ." (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1394; see *Adoption of Hannah S.* (2006) 142 Cal.App.4th 988, 1000, fn. 1.) Accordingly, under both family law and general contract law, because of her status as Nicholas' adoptive mother and her role as a party to the agreement for post adoption contact between her adopted son and his half-sister, Irene M. has standing to enforce the agreement. (See Civ. Code, § 1550; Fam. Code, § 8616.5.)[9]

2.      *The "Visitation" Portion of the Agreement*

Here, Irene M. seeks enforcement of the "visitation" clause of the Family Code section 8616.5 agreement. She submitted to the court a plan, under the terms of which Samantha would initially spend "3 weeks each summer in California . . . ." After two years, Samantha would spend four weeks each summer in California. In addition, "[i]n even years, Samantha would spend the first half of winter break (which includes

---

[9]      Civil Code section 1550 provides: "It is essential to the existence of a contract that there should be: [¶] 1. Parties capable of contracting; [¶] 2. Their consent; [¶] 3. A lawful object; and, [¶] 4. A sufficient cause or consideration."

Family Code section 8616.5, subdivision (a) provides: "The Legislature finds and declares that some adoptive children may benefit from either direct or indirect contact with birth relatives, including the birth parent or parents [and siblings] . . . after being adopted. Postadoption contact agreements are intended to ensure children of an achievable level of continuing contact when contact is beneficial to the children . . . or parents . . . and adoptive parents. . . ."

10

Christmas) in California." Scott and Glori P. however, rejected the plan, determining that it was not in the best interests of their daughter.

At the same time, Nicholas M., who is now a party to the agreement as he is over the age of 12 (see Fam. Code, § 6816.5, subd. (d)), refuses to go to Missouri to visit his sister. According to Irene M., "[h]e doesn't feel comfortable with [the P.'s]."

It has been determined that "[t]he basic purpose of . . . adoption is to promote the welfare, protection and betterment of the child by providing the security of a stable adoptive home . . . and to confer upon the [adoptive] parents discretion to provide for the best interests of the adopted child . . . . " (*In re Noreen G., supra*, 181 Cal.App.4th at p. 1391.) So too, "[a]greements that provide for birth parents [or siblings] to continue visitation . . . following . . . adoption . . . must be found by the court to be in the best interests of the children." (*Id*. at p. 1394, citing Fam. Code, § 8616.5, *Adoption of Hannah S., supra,* 142 Cal.App.4th at p. 1000, fn. 1.)

In view of the facts presented, the trial court properly exercised its discretion when it denied Irene M.'s motion for enforcement of the visitation section of the Family Code section 8616.5 post-adoption contact agreement. "While [a] child's 'best interest' is 'an elusive guideline that belies rigid definition,' obviously overall '[i]ts purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' (*Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704.)" (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 437, superseded on other grounds in *Adoption of Joshua S.* (2008) 42 Cal.4th 945, 954.)

11

Given the animosity between each child's respective parents and each parents' "fundamental liberty interest in the care, custody, and control of their [child] . . . . " (*In re Zachary D.* (1999) 70 Cal.App.4th 1392, 1399), the trial court properly refused to "order either family to require their child to fly cross country in order to visit." Its direction that, "in light of the fact that the families are some 2000 miles apart, both siblings are to have non monitored contact via telephone, e-mail, letters, and Skype" and that both families are to "use [their] best efforts to arrange personal visits between the siblings . . . " was sufficient to enforce the underlying purpose of the contract:  that Nicholas and Samantha remain in contact.[10]

---

[10] It should be noted that in making its ruling, the trial court also followed the premise that parents have a "fundamental right to make decisions concerning the care, custody, and control of [their] children."  (*In re Marriage of W.* (2003) 114 Cal.App.4th 68, 73, citing *Troxel v. Granville* (2000) 530 U.S. 57, 68-70.)  " 'There is a presumption that fit parents act in the best interests of the children,' and when a fit parent's decision is judicially challenged, the trial court must give the parent's decision "special weight." '  (*Troxel, supra*, 530 U.S. at pp. 68-70.)"  (*In re Marriage of W., supra,* 114 Cal.App.4th at p. 73.)

Here, none of the parties requested modification or termination of the visitation clause of the agreement due to a "substantial change of circumstances" and the trial court did not suggest that a modification be made or was "necessary to serve the best interests of the [children]" or the parents.  (Fam. Code, § 8616.5, subd (h)(2).)  Instead, by exercising its discretion in making its order that the parents continue to attempt to find a way for Nicholas and Samantha to visit, the trial court appeared to consider the significance of the visitation provision of the agreement while, at the same time, giving each parent's concerns "special weight."

12

## *DISPOSITION*

The trial court's order denying Irene M.'s motion to enforce the "visitation" portion of the Family Code section 8616.5 postadoption contact agreement is affirmed. Each party shall bear its own costs.

### *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

CROSKEY, Acting P. J.

WE CONCUR:

KITCHING, J.

ALDRICH, J.