Filed 12/29/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| GROSSMONT UNION HIGH SCHOOL DISTRICT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>DIEGO PLUS EDUCATION CORPORATION et al.,<br><br>    Defendants and Respondents;<br><br>WESTERN EDUCATIONAL CORPORATION et al.,<br><br>    Real Parties in Interest and Respondents;<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>    Intervener and Appellant. | D080295<br><br><br>(Super. Ct. No. 37-2015-00033720-CU-WM-CTL) |

APPEAL from an order of the Superior Court of San Diego County, David J. Danielsen, Judge.  (Retired Judge of the San Diego Sup. Ct.

assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Conditionally reversed and remanded with directions.

Orbach Huff & Henderson, Sarah Sutherland and Whitney N. Antrim for Plaintiff and Appellant.

Blank Rome, Gregory M. Bordo and Christopher J. Petersen for Defendants, Real Parties in Interest and Respondents.

Higgs Fletcher & Mack, John Morris, Steven M. Brunolli; San Diego Unified School District, Andra Greene for Intervener and Appellant.


This case, which involves a dispute regarding public charter schools operating within the geographic boundaries of Grossmont Union High School District (Grossmont Union) and San Diego Unified School District (SDUSD) is before us for a second time.  Specifically, this appeal concerns the trial court's order requiring that Grossmont Union and SDUSD pay attorney fees pursuant to Code of Civil Procedure section 1021.5[1] to the charter school corporate entities who prevailed in the appeal that we decided in 2021. (*Grossmont Union High Sch. Dist. v. Diego Plus Education Corp.* (Feb. 19, 2021, D076221) [nonpub. opn.] (*Grossmont 2021*).)  Those charter school corporate entities are Diego Plus Education Corporation (Diego Plus), Western Educational Corporation (Western Educational), Lifelong Learning Administration Corporation (Lifelong Learning) and Educational Advancement Corporation (EAC) (collectively, "the Charter School Corporate Entities").  In *Grossmont 2021*, we reversed the trial court's orders (1) enjoining the Charter School Corporate Entities from operating any charter school within the geographic boundaries of Grossmont Union and

---

[1]     Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

SDUSD, and (2) ordering the issuance of writs of mandate requiring that Julian Union Elementary School District (Julian Union) revoke the charter of Diego Valley East Public Charter School (Diego Valley East) and that Dehesa Elementary School District (Dehesa) revoke the charter of Diego Hills Central Public Charter School (Diego Hills Central).

Grossmont Union and SDUSD contend that the trial court erred in ordering them to pay the attorney fees incurred by the Charter School Corporate Entities while successfully litigating the issues we addressed in *Grossmont 2021* because the prerequisites for an award under section 1021.5 are not present. Grossmont Union and SDUSD further contend that the trial court abused its discretion in determining the amount of attorney fees to be paid.

We conclude that the trial court abused its discretion by failing to evaluate one issue relevant to the Charter School Corporate Entities' entitlement to an award of attorney fees, namely, whether "the . . . financial burden of private enforcement . . . [is] such as to make the award appropriate." (§ 1021.5, subd. (b).) Accordingly, a remand is required so that the trial court may properly exercise its discretion on that issue, applying the appropriate legal standard. We further determine that, assuming the Charter School Corporate Entities are entitled to a fee award, the trial court did not abuse its discretion in determining the amount of the award.

Accordingly, we conditionally reverse the order requiring Grossmont Union and SDUSD to pay attorney fees pursuant to section 1021.5, with specific directions that the trial court apply the proper legal standard in examining whether the "financial burden of private enforcement . . . [is] such as to make the award appropriate." (§ 1021.5, subd. (b).) We express no view on how the trial court should rule on that issue. Our reversal of the order

3

awarding attorney fees shall remain in place unless the trial court determines, on remand, that an attorney fee award is warranted. In such a case, the trial court shall reinstate the order awarding attorney fees in the original amount of $582,927 to the Charter School Corporate Entities, along with any additional attorney fees reasonably incurred in this appeal or on remand. (See *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1226, fn. 5 (*Whitley*) ["[I]t is well established that the attorney fees for work necessary to recover those fees, such as reasonable effort expended on the present appeal, are to be included in the fee award."].)

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Much of the relevant factual and procedural background is set forth in *Grossmont 2021*.[2] (*Grossmont 2021, supra*, D076221.) In presenting the background pertinent to this appeal, we will summarize or quote from selected portions of *Grossmont 2021*. As we did in *Grossmont 2021*, we begin with an overview of the applicable law governing charter schools in California.

A. *The Charter Schools Act*

The operation of charter schools in California is governed by the Charter Schools Act of 1992 (Ed. Code, § 47600 et seq.) (Charter Schools Act). In 2002, the Charter Schools Act was amended to add stringent geographic restrictions for the operation of charter schools. (See Ed. Code, §§ 47605, subd. (a)(1), 47605.1; Stats. 2002, ch. 1058, §§ 6, 7; see also *California School Bds. Assn. v. State Bd. of Education* (2010) 186 Cal.App.4th 1298 (*California*

---

[2] On November 14, 2022, Grossmont Union and SDUSD filed an unopposed request that we take judicial notice of the appellate record filed in connection with the appeal that we decided in *Grossmont 2021*. We grant the request.

4

*School Bds. Assn.*) [summarizing the statutory framework applicable to public charter schools].)

As we explained in *Grossmont 2021*, during the period when this case was litigated, the Charter Schools Act set forth several exceptions to the general rule that a charter school must locate within the geographic boundaries of the school district that approves its charter. (*Grossmont 2021, supra*, D076221.) Specifically, *Grossmont 2021* identified two relevant exceptions. The first exception applied, in general, when a charter school was unable to locate within the geographic boundaries of the chartering school district. (Former § 47605.1, subd. (d); Stats. 2016, ch. 186, § 46.) In *Grossmont 2021*, we referred to that provision as "the Unable-to-Locate exception." (*Grossmont 2021, supra*, D076221.) Second, the Charter Schools Act's geographic limitations "do not apply to a charter school that provides instruction exclusively in partnership with" the federal Workforce Innovation and Opportunity Act (29 U.S.C. § 3101 et seq.) or certain other federal and state programs that are not relevant here. (Former § 47605.1, subd. (g), now codified as § 47605.1, subd. (f).) In *Grossmont 2021*, we referred to that provision as "the WIOA exception." (*Grossmont 2021, supra*, D076221.)

B.    *The Initial Phase of the Underlying Litigation, in Which the Trial Court Enters Judgment in Favor of Grossmont Union and SDUSD but Stays the Issuance of Writs of Mandate*

In 2015, Grossmont Union filed a lawsuit against several entities, alleging that Diego Plus violated the Charter Schools Act by operating Diego Valley Public Charter and Diego Hills Public Charter School within Grossmont Union's geographic boundaries. (*Grossmont 2021, supra*, D076221.) The charter of Diego Valley Public Charter was approved by Julian Union, and the charter of Diego Hills Public Charter School was approved by Dehesa. Grossmont Union sought a writ of mandate and

5

declaratory and injunctive relief against Diego Plus and the school districts that approved the schools' charters. (*Ibid.*)

SDUSD filed a complaint in intervention in the litigation initiated by Grossmont Union. (*Grossmont 2021, supra*, D076221.) SDUSD sought a writ of mandate and declaratory and injunctive relief, alleging that Diego Plus also operated Diego Hills Public Charter School within the geographic boundaries of SDUSD in violation of the Charter Schools Act. (*Grossmont 2021, supra*, D076221.)

While the litigation was pending, *Anderson Union High School Dist. v. Shasta Secondary Home School* (2016) 4 Cal.App.5th 262 (*Anderson*) was issued, resolving a dispute concerning the Charter Schools Act's geographic restrictions. (*Grossmont 2021, supra*, D076221.) *Anderson* held that even if a charter school operates through resource centers rather than through classroom-based instruction (as was the case with respect to the Diego Plus's charter schools at issue in this litigation), the school's operations must be restricted to the boundaries of the chartering school district *unless* the school falls into one of the statutory exemptions that allow a charter school to operate outside the geographic boundaries of the chartering school district, such as the Unable-to-Locate exception (former § 47605.1, subd. (d)) and the WIOA exception (§ 47605.1, subd. (f)). (*Anderson*, at pp. 275-277, 283.)

Following the *Anderson* opinion, the trial court granted the petition for writ of mandate filed by Grossmont Union, concluding that the charter of Diego Valley Public Charter must be revoked for failure to comply with the geographic restrictions in the Charter Schools Act. (*Grossmont 2021, supra*, D076221.) Before judgment was entered, the State Board of Education granted a temporary waiver that allowed Diego Valley Public Charter to operate until June 30, 2018. (*Ibid.*) In light of that waiver, on August 2,

6

2017, the trial court entered judgment in favor of Grossmont Union, but stayed the issuance of the writ of mandate. (*Ibid.*) The judgment stated that the writ of mandate compelling Julian Union to revoke the charter of Diego Valley Public Charter would be stayed during the period of the waiver granted by the State Board of Education, and that "the writ will be issued and become effective only if Diego Valley Public Charter continues to operate resource centers in violation of the Education Code upon the expiration of the waiver." (*Ibid.*)

Because SDUSD's petition for writ of mandate presented the same issues as Grossmont Union's petition, and because the State Board of Education had also granted a waiver to Diego Hills Public Charter School, allowing it to operate until June 30, 2018, the parties stipulated that the trial court would enter judgment in favor of SDUSD with respect to Diego Hills Public Charter School based on the terms of Grossmont Union's judgment. (*Grossmont 2021, supra*, D076221.) Specifically, the judgment in favor of SDUSD stated that a writ compelling Dehesa to revoke the charter of Diego Hills Public Charter School would "be issued and become effective only if Diego Hills [Public Charter School] continues to operate resource centers in violation of the Education Code upon the expiration of the waiver." (*Ibid.*)

The trial court subsequently awarded attorney fees to Grossmont as a successful party pursuant to section 1021.5. Among other things, the trial court stated that an award of attorney fees under section 1021.5 was warranted because the litigation "implicated the constitutional right to an education" and its outcome impacted public school students.

7

C.   *Grossmont Union and SDUSD File Postjudgment Motions Requesting That the Trial Court Lift the Stay on the Issuance of the Writs of Mandate and That It Grant Relief Regarding Different Charter Schools*

In response to the *Anderson* opinion, Diego Plus decided to close down both Diego Valley Public Charter and Diego Hills Public Charter School in 2018.  (*Grossmont 2021, supra*, D076221.)  However, Diego Plus implemented a plan to continue certain charter school operations within the geographic boundaries of Grossmont Union and SDUSD by creating two *new* charter schools under the Unable-to-Locate exception:  (1) Diego Valley East, whose charter was approved by Julian Union; and (2) Diego Hills Central, whose charter was approved by Dehesa.  (*Ibid.*)  Both Diego Valley East and Diego Hills Central commenced operations and enrolled students.  (*Ibid.*)

In addition, after Diego Valley Public Charter and Diego Hills Public Charter School closed, the facilities at two of the locations within the geographic boundaries of Grossmont Union that were formerly used by the now-closed schools were transitioned to use by another charter school, San Diego Workforce Innovation High School (SDWIHS).  (*Grossmont 2021, supra*, D076221.)  SDWIHS was operated by one of the Charter School Corporate Entities—Western Educational—and its charter petition was originally approved by the Borrego Springs Unified School District (Borrego Springs Unified), effective July 1, 2016.  (*Ibid.*)

In June 2017, Borrego Springs Unified approved a revision to SDWIHS's charter, which added additional locations where the school would operate resource centers.  (*Grossmont 2021, supra*, D076221.)  Within the geographic boundaries of Grossmont Union, those new locations included facilities where Diego Valley Public Charter and Diego Hills Public Charter School had previously operated resource centers.  (*Ibid.*)  The revised charter petition also listed a location within the geographic boundaries of SDUSD.

8

(*Ibid.*) According to SDWIHS's revised charter petition, it relied on the WIOA exception (§ 47605.1, subd. (f)) to operate resource centers outside the geographic boundaries of Borrego Springs Unified. (*Grossmont 2021, supra*, D076221.)

In December 2018, Grossmont Union filed a motion requesting that the trial court lift its stay on the writ of mandate ordered in the 2017 judgment. (*Grossmont 2021, supra*, D076221.) Grossmont Union argued that the conditions to lift the stay had been satisfied, "as the [State Board of Education] waivers have expired and Julian Union and Diego Plus continue to operate out-of-district charter schools in violation of the [Charter Schools Act]." (*Ibid.*) Grossmont Union argued that the stay should be lifted and a writ of mandate should issue because "[d]efendants feigned compliance with the Court's decision and the [Charter Schools Act] by incorporating the same students and the same illegal facilities under two 'new' charter schools operated and overseen by the same persons while claiming to qualify for the same statutory exceptions already rejected by this Court—perpetuating the same illegal program." (*Ibid.*) Further, Grossmont Union contended that Diego Valley East was operating in violation of the Charter Schools Act because it did not qualify for the Unable-to-Locate exception. (*Grossmont 2021, supra*, D076221.)

Grossmont Union's motion also challenged SDWIHS's newly added resource centers in Lakeside and Lemon Grove, operated by Western Educational. (*Grossmont 2021, supra*, D076221.) Grossmont Union argued that it was entitled to a "permanent injunction prohibiting . . . SDWIHS from operating within [Grossmont Union's] boundaries" because it allegedly did not qualify for the WIOA exception, and because "[b]y sweeping the same

9

illegal facilities and WIOA ineligible students into a new charter, Diego Plus merely exchanged one illegal charter school for another." (*Ibid.*)

Although neither Western Educational nor Borrego Springs Unified (the school district that chartered SDWIHS) were parties to the 2017 judgment, Grossmont Union argued that it was still entitled to an injunction in the context of its lawsuit against Diego Plus and Julian Union because "SDWIHS is controlled by the same people and organization" that controlled Diego Valley Public Charter and Diego Hills Public Charter School. (*Grossmont 2021, supra*, D076221.) To support this allegation, Grossmont Union explained that "Diego Plus is one branch of a large group of related corporations operating charter schools throughout the State and all controlled by the Lifelong Learning Administration Corporation . . . under the Learn4Life trade name," and that Western Educational was part of that group. (*Ibid.*) According to Grossmont Union, "Learn4Life/Lifelong Learning have used their charter schools as an elaborate shell game, shifting students from schools subject to lawsuits . . . to other Learn4Life schools to avoid compliance with the [Charter Schools Act's] location requirements." (*Ibid.*)

D. *The Trial Court Grants the Postjudgment Motions*

On May 31, June 3, and June 7, 2019, the trial court held a hearing on Grossmont Union's postjudgment motion. (*Grossmont 2021, supra*, D076221.) The hearing included the presentation of witness testimony over the course of two days. (*Ibid.*) The testimony focused on Grossmont Union's contention that Western Educational (which operated SDWIHS) and Diego Plus were alter egos of each other, and that both of those corporations belonged to a commonly controlled group composed of the Charter School Corporate Entities, which also included Lifelong Learning and EAC. (*Ibid.*)

10

In a June 28, 2019 written order following the hearing, the trial court granted Grossmont's motion. (*Grossmont 2021, supra*, D076221.) First addressing the alter ego allegations, the trial court found "that the evidence submitted by [Grossmont Union] more than sufficiently establishes that the previously unnamed Respondents (EAC, [Lifelong Learning], [Western Educational], and SDWIHS) are the alter egos of Diego Plus and that they fully participated in and controlled the underlying litigation against Diego Plus." (*Ibid.*) The trial court stated, "Learn4Life is more than a trademark: It is, in fact, a single entity operating all of the charter schools at issue in these proceedings." (*Ibid.*)

Next, the trial court addressed whether the issuance of a writ of mandate as to Diego Valley East was warranted. (*Grossmont 2021, supra*, D076221.) The trial court ruled that Diego Valley East was not a new charter school, but rather an "old charter school" with a "different name[ ]." (*Ibid.*) It explained that because Diego Valley Public Charter could not have availed itself of the Unable-to-Locate exception, Diego Valley East also could not do so and was therefore operating in violation of the Charter Schools Act and the court's 2017 judgment. (*Grossmont 2021, supra*, D076221.)

Finally, the trial court addressed whether relief was warranted as to SDWIHS. (*Grossmont 2021, supra*, D076221.) The trial court determined that Western Educational "dba SDWIHS" was not a new charter school but was the alter ego of Diego Plus. (*Ibid.*) The trial court stated that there was no evidence that SDWIHS's program was different from Diego Valley Public Charter's former program or that it otherwise qualified for an exception to the Charter Schools Act's geographic restrictions. (*Ibid.*) Accordingly, the trial court concluded that SDWIHS was operating in violation of the Charter

Schools Act and the court's 2017 judgment. (*Grossmont 2021, supra*, D076221.)

The trial court ordered the following remedy:

> "(1) The stay of this court's 2017 statement of decision, writ, and judgment is hereby lifted.

> "(2) This court hereby amends its prior writ of mandate to direct Julian [Union] to immediately revoke the charter of Diego Valley East. . . . The court further directs the Clerk of the Court to issue under seal of this court a writ of mandate in the form attached hereto as Exhibit A.

> "(3) The Court hereby issues a permanent injunction against Diego Plus precluding Diego Plus from operating charter school facilities within [Grossmont Union's] school district boundaries, either directly, or indirectly through any of Diego Plus's related Learn4Life charter school entities that presently exist or may be formed in the future for the purpose of operating charter schools, including but not limited to EAC, [Lifelong Learning], [Western Educational] and SDWIHS. This injunction shall remain in effect until further order from this Court." (*Grossmont 2021, supra*, D076221.)

On June 28, 2019, the clerk of the court issued a writ of mandate, commanding Julian Union to immediately revoke the charter of Diego Valley East. (*Grossmont 2021, supra*, D076221.)

SDUSD filed a motion seeking similar relief, which would prevent Diego Hills Central and SDWIHS from operating within the geographic boundaries of SDUSD. (*Grossmont 2021, supra*, D076221.) Specifically, SDUSD sought to lift the stay of the 2017 judgment and to obtain (1) a writ of mandate directing Dehesa to revoke the charter of Diego Hills Central; and (2) an order permanently enjoining the Charter School Corporate Entities from operating charter school facilities, including SDWIHS, within the

geographic boundaries of SDUSD. (*Ibid.*) At the hearing on the motion, the trial court expressed the view that the Unable-to-Locate exception was "legally unavailable" to Diego Hills Central because it was only "pretending" to be a new school, but in fact was the same school as Diego Hills Public Charter School, which indisputably did not meet the requirements for the exception. (*Ibid.*)

On August 5, 2019, the trial court issued an order granting SDUSD's motion. (*Grossmont 2021, supra*, D076221.) The order stated,

> "(1) The Court hereby lifts any remaining stay on the issuance of its writ of mandate . . . .
>
> "(2) The Court amends its previous order and hereby issues a writ of mandate to direct [Dehesa] to revoke the charter of [Diego Hills Central] and further issues a permanent injunction to preclude Diego Plus from operating any charter school facilities within [SDUSD's] boundaries, either directly or through any of Diego Plus' related Learn4Life charter school entities, including but not limited to [Western Educational] and [SDWIHS]. This injunction shall remain in effect until further order from this Court." (*Ibid.*)

After Grossmont Union and SDUSD prevailed on their postjudgment motions, the trial court awarded attorney fees to them pursuant to section 1021.5.[3]

E. *In Grossmont 2021, the Charter School Corporate Entities Prevail on Appeal in Defeating the Postjudgment Motions*

In *Grossmont 2021*, we reversed the trial court's orders granting Grossmont Union's and SDUSD's postjudgment motions, and we ordered the trial court to direct the clerk of the court to withdraw any writ of mandate

---

[3] The trial court subsequently vacated those awards after *Grossmont 2021* reversed the orders granting the postjudgment motions.

13

that issued as a result of its June 28, 2019 and August 5, 2019 orders. (*Grossmont 2021, supra*, D076221.)

With respect to the lifting of the 2017 stays, we observed that the stays could be lifted only if Diego Valley Public Charter and Diego Hills Public Charter School continued to operate resource centers in violation of the Charter Schools Act. However, as we explained, those schools were no longer in operation, and there were important differences between the newly chartered schools and the now-closed schools. (*Grossmont 2021, supra*, D076221.) We stated that "the new schools are distinct entities from the now-closed schools because they came into existence due to different charters, and because there are undisputed differences in their operations." (*Ibid.*) Moreover, we noted that even if the new schools were treated as interchangeable with the now-closed schools, the new schools did not operate in violation of the Charter Schools Act because they fell under the Unable-to-Locate exception. (*Grossmont 2021, supra*, D076221.) Specifically, "[t]he Unable-to-Locate exception has specific requirements that were set forth in the Charter Schools Act. (Former § 47605.1, subd. (d).) All of the evidence indicates that Diego Valley East and Diego Hills Central met those requirements." (*Ibid.*) Among other things, we explained that "nothing in the Charter Schools Act prohibits a charter school operator from closing a school and then opening a new school, at the same location, under the procedures outlined in the statute for the Unable-to-Locate exception." (*Ibid.*)

With respect to the permanent injunctions preventing the Charter School Corporate Entities from operating any charter school facility within the boundaries of Grossmont Union or SDUSD (including SDWIHS), we reversed them because (1) the stay should not have been lifted, preventing the issuance of any additional relief; and (2) in any event, the injunctions

14

"were not necessary to enforce the writs of mandate, and they added additional substantive relief not ordered in the 2017 judgments." (*Grossmont 2021, supra*, D076221.)

F. *The Trial Court Awards Attorney Fees to the Charter School Corporate Entities Pursuant to Section 1021.5*

After remand, the Charter School Corporate Entities filed a motion in the trial court seeking an award, pursuant to section 1021.5, of the attorney fees they incurred, both in the trial court and on appeal, in opposing Grossmont Union's and SDUSD's postjudgment motions. In opposition, Grossmont Union and SDUSD argued that the requirements for a fee award under section 1021.5 were not met, and that the fees sought by the Charter School Corporate Entities were not in a reasonable amount.

The trial court granted the motion, concluding in a minute order that the requirements for an award under section 1021.5 were present. Among other things, the trial court determined that "[c]ompliance with the [Charter Schools Act] is an important right affecting countless students and school districts, and the harm prevented to [the Charter School Corporate Entities] resulted in a significant benefit to these students who were not prevented from attending the charter schools." After receiving additional briefing regarding the reasonableness of the $718,232.50 in fees sought by the Charter School Corporate Entities, the trial court ordered Grossmont Union and SDUSD to pay $582,927 in fees to the Charter School Corporate Entities.

Grossmont Union and SDUSD appeal from the trial court's award of attorney fees to the Charter School Corporate Entities. They contend both that (1) the requirements for a fee award under section 1021.5 are not present, and (2) the amount of the fees awarded by the trial court was unreasonably high.

15

II.

DISCUSSION

A.  *The Challenge to the Trial Court's Decision That an Award of Fees Was Warranted Under Section 1021.5*

We first consider whether, as Grossmont Union and SDUSD contend, the trial court erred in ruling that the Charter School Corporate Entities are entitled to attorney fees pursuant to section 1021.5.

1.  *Applicable Legal Standards*

"As a general rule, parties in litigation pay their own attorney's fees. [Citation.]  Section 1021.5 is an exception to that rule.  [Citation.]  Derived from the judicially crafted 'private attorney general doctrine' [citation], section 1021.5 is aimed at encouraging litigants to pursue meritorious public interest litigation vindicating important rights and benefitting a broad swath of citizens, and it achieves this aim by compensating successful litigants with an award of attorney's fees." (*La Mirada Avenue Neighborhood Assn. of Hollywood v. City of Los Angeles* (2018) 22 Cal.App.5th 1149, 1155-1156.)

Section 1021.5 provides in relevant part:  "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if:  (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."[4]  (§ 1021.5.)

---

[4]  "The third factor of . . . section 1021.5 does not apply where, as here, [an] action produces no monetary recovery."  (*Weiss v. City of Los Angeles*

16

"The threshold requirement for a fee award under section 1021.5 is proof that the fee applicant is a 'successful party.' " (*Protect Our Water v. County of Merced* (2005) 130 Cal.App.4th 488, 493 (*Protect Our Water*) [quoting § 1021.5].)  " 'The term "successful party," as ordinarily understood, means the party to litigation that achieves its objectives.' [Citation.]  The term is not limited to plaintiffs, petitioners, or real parties in interest aligned with plaintiffs or petitioners.  [Citations.]  Rather, the term is synonymous with 'prevailing party' and theoretically may apply to any party to the litigation—whether plaintiff, petitioner, defendant, respondent, or real party in interest." (*Save Our Heritage Organisation v. City of San Diego* (2017) 11 Cal.App.5th 154, 160 (*Save Our Heritage*).)

Once that threshold requirement is met, " '[i]n determining whether to award attorney fees under section 1021.5 to the "successful party," we apply a three-prong test inquiring whether (1) the litigation resulted in the enforcement of an important right affecting the public interest, (2) a

(2016) 2 Cal.App.5th 194, 218; see also *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 935 (*Woodland Hills*) ["Inasmuch as plaintiffs' action has produced no monetary recovery, factor '(c)' of section 1021.5 is not applicable."].)  In their appellate briefing, Grossmont Union and SDUSD contend that "[t]he final element one must establish to prove entitlement to an award of private attorney general fees is that, in the interests of justice, the fees are more properly borne by the public than by the successful litigant."  To support this argument, they cite generally to section 1021.5 (but do not quote it), and to case law that discusses factor "(c)" of that statute.  (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 157; *Rider v. County of San Diego* (1992) 11 Cal.App.4th 1410, 1422.)  We therefore understand Grossmont Union and SDUSD to be arguing that an "interest of justice" analysis should be undertaken based on factor "(c)" of section 1021.5, which looks to whether "such fees should not in the interest of justice be paid out of the recovery, if any." (§ 1021.5.)  However, because that portion of section 1021.5 does not apply where, as here, there was no monetary recovery (*Weiss,* at p. 218)*,* the argument is misplaced.

17

significant benefit has been conferred on the general public or a large class of individuals, and (3) the necessity and financial burden of private enforcement renders the award appropriate.' " (*Save Our Heritage, supra*, 11 Cal.App.5th at p. 159; see also *Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1026 [setting forth the three-pronged inquiry].)

" 'Although the statute is phrased in permissive terms, a court's discretion to deny attorney's fees to a party that meets the statutory requirements of section 1021.5 is limited. [Citation.] Unless special circumstances would render an award of section 1021.5 fees *unjust*, fees must be awarded under the statute where the statutory criteria are met.' " (*Burgess v. Coronado Unified School Dist.* (2020) 59 Cal.App.5th 1, 7; see also *Save Our Heritage, supra*, 11 Cal.App.5th at pp. 160-161 [discussing the circumstance in which a fee award would be unjust because " 'the party from whom fees are sought "is not the type of party on whom private attorney general fees were intended to be imposed" ' "].)

2.      *Standard of Review*

The parties disagree regarding the standard of review that we should apply when reviewing the trial court's ruling that an award of attorney fees is warranted pursuant to section 1021.5. "Generally speaking, a trial court's decision whether to award attorney fees under section 1021.5 is reviewed for abuse of discretion. [Citation.] However, ' " 'de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law.' " ' " (*City of*

18

*Oakland v. Oakland Police & Fire Retirement System* (2018) 29 Cal.App.5th 688, 698 (*City of Oakland*).)[5]

Grossmont Union and SDUSD do not contend that any issue of statutory construction or any other question of law is involved in their appeal of the fee award. However, they argue that we should abandon the generally applicable abuse of discretion standard of review in favor of a de novo standard because *Grossmont 2021* serves as the basis for the Charter School Corporate Entities' claim that they are entitled to an award of fees.

Specifically, Grossmont Union and SDUSD rely on a line of cases observing that when a previous appellate opinion serves as the basis for a party's contention that it is a successful party entitled to an award of fees under section 1021.5, the appellate court is often in as good a position as the trial court to determine whether the requirements of section 1021.5 are met. (See, e.g., *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217, 223, 228-230

---

[5] When an abuse of discretion standard is appropriate, " ' "[t]he pertinent question is whether the grounds given by the court . . . are consistent with the substantive law of . . . section 1021.5 and, if so, whether their application to the facts of this case is within the range of discretion conferred upon the trial courts under section 1021.5, read in light of the purposes and policy of the statute." ' " (*City of Oakland, supra,* 29 Cal.App.5th at p. 698.) " '[D]iscretion may not be exercised whimsically and, accordingly, reversal is appropriate "where no reasonable basis for the action is shown." ' " (*Baggett v. Gates* (1982) 32 Cal.3d 128, 143 (*Baggett*).) Further, "[a]n abuse of discretion occurs when the exercise of discretion is predicated upon factual findings that are not supported by substantial evidence." (*Indio Police Command Unit Assn. v. City of Indio* (2014) 230 Cal.App.4th 521, 541.)

(*Environmental Protection Information Center*).)[6]  Indeed, our colleagues in the Second District have gone so far as to hold that when an appellate court's previous published opinion is the basis for a fee award under section 1021.5, the appellate court should apply a de novo standard of review on an appeal from the fee award.  (*Wilson v. San Luis Obispo County Democratic Central Com.* (2011) 192 Cal.App.4th 918, 924 (*Wilson*) ["where, as here, our published opinion provides the basis upon which attorney fees are sought, de novo or independent review is appropriate because we are in at least as good a position as the trial court to determine whether section 1021.5 fees should be awarded"]; *Samantha C. v. State Dept. of Developmental Services* (2012) 207 Cal.App.4th 71, 78 [quoting and following *Wilson* in applying a de novo standard of review]; *Mounger v. Gates* (1987) 193 Cal.App.3d 1248, 1258 ["the appellate court does not have to defer totally to the trial court's resolution of the four elements of the standard in section 1021.5 when the legal work resulted in a published appellate court opinion."].)  However, as we will

---

[6]     Grossmont Union and SDUSD place great reliance on *Environmental Protection Information Center* because it observes that an appellate court that has issued an opinion on the merits may be better positioned than the trial court to determine whether " 'its own opinion is "important" and "protects the public interest" and whether the existence of that opinion confers a "significant benefit on the general public or a large class of persons." ' " (*Environmental Protection Information Center, supra*, 190 Cal.App.4th at p. 229.)  However, that observation was not made in discussing the relevant standard of review.  Instead, the appellate court made the comments in explaining that, prior to remanding an appeal of an attorney fee award to the trial court to reconsider the award in light of an intervening California Supreme Court opinion on the underlying merits, it would decide, in the first instance, certain issues that would be relevant, on remand, to the trial court's renewed examination of the fee award.  (*Id.* at pp. 223, 228-230.)

explain, we are not persuaded by the Second District's case law that de novo review is appropriate here.

For one thing, the rule of de novo review described by the Second District applies to cases in which there has been a previous *published* opinion. (See, e.g., *Wilson, supra*, 192 Cal.App.4th at p. 924 [describing a situation where a "published opinion provides the basis upon which attorney fees are sought"].) *Grossmont 2021* was not published.

More importantly, however, even if *Grossmont 2021* had been published, we would not apply de novo review because our Supreme Court has made clear that awarding attorney fees involves the application of " 'traditional equitable discretion' " by the trial court, followed by only limited appellate review. (*Baggett, supra*, 32 Cal.3d at p. 142). Specifically, as our Supreme Court has explained, "[t]he decision as to whether an award of attorney fees is warranted rests initially with the trial court. [Citation.] '[U]tilizing its traditional equitable discretion,' that court 'must realistically assess the litigation and determine, from a practical perspective' [citation] whether or not the statutory criteria have been met." (*Ibid.*) In that specific context, where the "trial court has discretionary power to decide an issue, its decision will be reversed *only* if there has been a prejudicial abuse of discretion." (*Id.* at pp. 142-143, italics added.) Accordingly, when the trial court makes a decision to award attorney fees using its traditional equitable discretion, it is not our role to reweigh the equities. Our task on appeal is limited to conducting a review for abuse of discretion.

Moreover, it would create needless judicial inefficiency if we were to apply de novo review in any case where the trial court awards attorney fees pursuant to section 1021.5 after an appellate court opinion resolves the litigation. Our Supreme Court has held that an appellate court may choose,

*in the first instance*, to award attorney fees pursuant to section 1021.5 as part of an opinion in favor of the party seeking the fee award. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 427.) But the appellate court's role in awarding attorney fees *in the first instance*, if it chooses to do so, is different from the role the appellate court undertakes *in reviewing* a trial court's exercise of its discretion to award fees. The rule set forth in *Laurel Heights* works in the interest of judicial efficiency, allowing an appellate court—in an appropriate case—to award attorney fees under section 1021.5 after a successful appeal, without ever involving the trial court. The de novo review advocated by Grossmont Union and SDUSD, in contrast, would work *against* the interest of judicial efficiency because any losing party in a motion for attorney fees in the trial court would have an incentive to appeal to obtain a fresh look at the motion by the appellate court. As a result, both the trial court and the appellate court would be required to engage in the *duplicative* effort of undertaking a full-scale equitable inquiry into the advisability of awarding attorney fees pursuant to section 1021.5.

We recognize that, in certain circumstances, the fact that we issued the appellate opinion that resolved the litigation will give us a better understanding of whether the trial court abused its discretion. This is especially true with respect to certain of the required elements for an award under section 1021.5. Specifically, as case law has observed, an appellate court that has previously issued an opinion in the matter may be in an especially favorable position to evaluate whether the fee applicant is a "successful party" (*Protect Our Water, supra,* 130 Cal.App.4th at p. 494), or whether the "earlier opinion vindicated an important right affecting the public interest and yielded a significant benefit." (*Schmier v. Supreme Court*

22

(2002) 96 Cal.App.4th 873, 880; see also *Bouvia v. County of Los Angeles* (1987) 195 Cal.App.3d 1075, 1083, fn. 7; *City of Oakland, supra,* 29 Cal.App.5th at p. 709; *Robles v. Employment Development Dept.* (2019) 38 Cal.App.5th 191, 203 (*Robles*); *McCormick v. Public Employees' Retirement System* (2023) 90 Cal.App.5th 996, 1005.) One opinion suggests that on these issues, "when an appellate court spots a questionable estimate or a faulty calculation it need not shrink from the task of correcting this element of the equation and reassessing whether that change alters the ultimate result." (*Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 11.) Nevertheless, the ultimate standard of review must remain an abuse of discretion standard. The issue before us is whether the trial court had "no reasonable basis" for its ruling (*Baggett, supra*, 32 Cal.3d at p. 143), not whether we would have reached the same decision as the trial court in the first instance.

3. *The Charter School Corporate Entities Were Successful Parties*

Turning to the substantive requirements for an award of attorney fees pursuant to section 1021.5, we first examine the threshold issue of whether the trial court abused its discretion in determining that the Charter School Corporate Entities were successful parties in opposing the postjudgment motions brought by Grossmont Union and SDUSD. (*Protect Our Water, supra*, 130 Cal.App.4th at p. 493.)[7] "The 'successful party' under section

___

[7] Although Grossmont Union and SDUSD argued to the trial court that the Charter School Corporate Entities were not successful parties, they appear to have conceded the issue in their opening appellate brief. Specifically, the opening appellate brief states that "[the Charter School Corporate Entities] were 'successful parties' to the extent this Court reversed the trial court's order enforcing its prior writ against them." We note that the introduction to Grossmont Union and SDUSD's appellate reply brief seems to

1021.5 is 'the party to litigation that achieves its objectives.' " (*Friends of Spring Street v. Nevada City* (2019) 33 Cal.App.5th 1092, 1108.) "When a court considers whether a party was successful in the litigation, the critical inquiry is the impact of the action, not the way in which the action was resolved." (*Vosburg v. County of Fresno* (2020) 54 Cal.App.5th 439, 463.) And when the party seeking attorney fees is a successful defendant, "the evaluation of success is based on a pragmatic assessment of the harm prevented . . . ." (*Ibid.*)

Here, the trial court reasonably concluded that the Charter School Corporate Entities were successful parties, as they ultimately prevailed in defending against Grossmont Union's and SDUSD's postjudgment motions. By doing so, they avoided a court order requiring the closure of Diego Valley East, Diego Hills Central and some of SDWIHS's locations, and they defeated an injunction that would have permanently prevented them from operating any future charter school facility with the geographic boundaries of Grossmont Union and SDUSD.

---

retract that concession, stating that "the trial court erred as a matter of law in deeming [the Charter School Corporate Entities] to be the 'prevailing parties' under . . . [s]ection 1021.5 . . . ." However, the remainder of the reply brief does not develop that argument. The argument that the Charter School Corporate Entities were not successful parties is forfeited because it is not developed and because it was not raised in the opening appellate brief. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218 (*Rangel*) [arguments were forfeited when raised for the first time in a reply brief]; *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075 [a point is treated as forfeited when a party "fails to support it with reasoned argument and citations to authority"].) Nevertheless, as it is a threshold requirement for the applicability of section 1021.5, we will exercise our discretion to address whether the Charter School Corporate Entities were successful parties.

24

4.  *The Litigation Resulted in an Important Right Affecting the Public Interest*

Having established the threshold requirement that the Charter School Corporate Entities were successful parties, the first part of the three-prong inquiry is whether "the litigation resulted in the enforcement of an important right affecting the public interest." (*Save Our Heritage, supra*, 11 Cal.App.5th at p. 159.) The "important public right" can have any legal source, "constitutional, statutory or other." (*Woodland Hills, supra*, 23 Cal.3d at p. 925.) "When determining whether a litigant has vindicated an important right affecting the public interest, '[t]he "judiciary [must] exercise judgment in attempting to ascertain the 'strength' or 'societal importance' of the right involved." [Citation.] "The strength or societal importance of a particular right generally is determined by realistically assessing the significance of that right in terms of its relationship to the achievement of fundamental legislative goals." ' " (*City of Oakland, supra*, 29 Cal.App.5th at p. 710.) "Regarding the nature of the public right, it must be important and cannot involve trivial or peripheral public policies." (*Ryan v. California Interscholastic Federation* (2001) 94 Cal.App.4th 1033, 1044.)

Here, the important public right at issue derives from the Charter Schools Act. "California's Constitution guarantees a free public education, established through 'a system of common schools.' (Cal. Const., art. IX, § 5.) Charter schools are part of this public system of common schools (Ed. Code, §§ 47601, 47615, subd. (a)(1)), but are '*strictly* creatures of statute.' " (*Sweetwater Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th 970, 989 (*Sweetwater Union*).) "The [Charter Schools Act] was adopted to widen the range of educational choices available within the public school system." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1202.) "The Legislature intended its authorization of

25

charter schools to improve public education by promoting innovation, choice, accountability, and competition." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 205-206 (*Today's Fresh Start*).) "Though independently operated, charter schools fiscally are part of the public school system; they are eligible equally with other public schools for a share of state and local education funding." (*Id.* at 206.) It is therefore no surprise that case law holds "[t]he chartering of a school and the charter school's compliance with the law, the regulations, and the conditions imposed on its charter can be matters of serious concern to the public and to our public school system." (*California School Bds. Assn., supra*, 186 Cal.App.4th at p. 1326 [allowing an action in mandamus to compel revocation of a charter].)

In *Sweetwater Union*, we directly addressed whether an action concerning compliance with the Charter Schools Act's geographic restrictions "enforced an important right affecting the public interest" to support an award of attorney fees under section 1021.5. (*Sweetwater Union, supra*, 36 Cal.App.5th at p. 990.) We concluded that the trial court did not abuse its discretion in awarding fees to a school district that successfully challenged a charter school's compliance with those restrictions. We explained that "requiring compliance with the geographic boundary requirements of the [Charter Schools Act] enforced an important right affecting the public interest." (*Ibid.*)

As in *Sweetwater Union, supra*, 36 Cal.App.5th 970, this action (including the postjudgment motions brought by Grossmont Union and SDUSD) involved the question of compliance with the geographic restrictions in the Charter Schools Act. Specifically, in their postjudgment motions, Grossmont Union and SDUSD sought to revoke the charter of Diego Valley

East and Diego Hills Central, and to enjoin the operation of some of SDWIHS's locations, based on the contention that they were operating in violation of those geographic restrictions. In *Grossmont 2021*, we rejected that contention, ruling that we saw no indication that those schools were operating in violation of the Charter Schools Act. (*Grossmont 2021, supra*, D076221.) Thus, in successfully defending against Grossmont Union's and SDUSD's postjudgment motions, the Charter School Corporate Entities advanced the important right of charter schools to continue operating within the legal strictures of the Charter Schools Act and to continue providing educational services to the public. Although the award of fees in *Sweetwater Union* was based on a litigation victory *for the challenging school district*, whereas the award of fees in the instant action was based on a litigation victory *in favor of the charter schools*, the distinction is not significant to our analysis. Whether based on a finding of *compliance* or a finding of *noncompliance* with the geographic restrictions in the Charter Schools Act, both litigation outcomes involved an important right affecting the public interest because they impacted the right of specific charter schools to continue providing educational services to students as part of California's public education system.

Grossmont Union and SDUSD seize upon the statement in the introductory section of *Grossmont 2021* that the issue we would address was "procedural and limited" even though it "play[ed] out in the context of an extended and complex policy dispute about the proper role of charter schools in the fabric of California's public education system." (*Grossmont 2021, supra*, D076221.) Grossmont Union and SDUSD contend that if *Grossmont 2021* was decided on limited procedural grounds and did not concern the interpretation of the Charter Schools Act, the Charter School Corporate

Entities did not enforce any important right affecting the public interest when they prevailed on appeal. We reject the argument.

Grossmont Union and SDUSD read too much into our statement. In *Grossmont 2021*, we emphasized the limited and procedural nature of the issues presented to emphasize that we would not be opining on any contentious public policy issues surrounding charter schools, which is a subject for the Legislature in the first instance. However, it was not our intention to signal that the resolution of the dispute before us was lacking in public significance or that we would not be addressing the application of the Charter Schools Act. Indeed, as we have explained, *Grossmont 2021 did* address whether the challenged charter schools were operating in violation of the Charter Schools Act and thus did address substantive issues that were not merely procedural.

Moreover, even were it accurate to describe the Charter School Corporate Entities as having prevailed solely on limited procedural grounds in *Grossmont 2021*, that fact would not be dispositive of whether an important right affecting the public interest was at issue. Our Supreme Court has rejected the distinction between a procedural victory and a substantive victory in the context of an attorney fee award. As we explained in *Sweetwater Union*, "[i]n *Woodland Hills*, the plaintiffs prevailed on a procedural rather than substantive basis and sought attorney fees under section 1021.5. (*Woodland Hills, supra*, 23 Cal.3d at p. 937.) The Supreme Court rejected defendant's contention that complying with a technical requirement 'does not rise to the level of an "important right" for purposes of section 1021.5.' (*Ibid.*) . . . The court explained that 'it would be both unfair and contrary to the legislative purpose of section 1021.5 to deprive a plaintiff of attorney fees simply because the court decides the case in plaintiff's favor

28

on a "simpler" or less "important" theory.' ([*Id.* at p. 938].) Rather, when a plaintiff prevails on a preliminary issue, a 'trial court, utilizing its traditional equitable discretion (now codified in § 1021.5), must realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award.' (*Ibid.*)" (*Sweetwater Union, supra*, 36 Cal.App.5th at p. 988.) Here, from a practical perspective, the trial court could reasonably conclude that by prevailing against Grossmont Union's and SDUSD's attempts to force Diego Valley East, Diego Hills Central, and certain locations of SDWIHS to cease operations, the Charter School Corporate Entities enforced important public rights concerning the system of public education that the Legislature conferred upon the residents of California when it enacted the Charter Schools Act.[8] It would be reasonable for the trial court to conclude that by vindicating the right of Diego Valley East, Diego Hills Central, and SDWIHS to continue to operate, the Charter School Corporate Entities enforced the Legislature's intended policy of using charter schools "to improve public education by promoting innovation, choice, accountability, and competition." (*Today's Fresh Start, supra*, 57 Cal.4th at pp. 205-206.) In short, the victory of the Charter School Corporate Entities was a victory for the right of the

_____

[8]    Grossmont Union and SDUSD contend that the victory by the Charter School Corporate Entities in preventing the closure of Diego Valley East, Diego Hills Central, and the relevant SDWIHS locations will be short lived because "when the time is right" they will bring "a new round of litigation that joins the same issues." The record contains no evidence of any such litigation. On the contrary, the only evidence before us is that, as a result of *Grossmont 2021*, Diego Valley East, Diego Hills Central, and the relevant SDWIHS locations were allowed to continue to operate, and the Charter School Corporate Entities were not enjoined from operating future charter school facilities within the geographic boundaries of Grossmont Union and SDUSD.

schools at issue to operate where they are legally permitted to do so, and for the members of the public served by those schools to continue to have the school choice intended by the Legislature in enacting the Charter Schools Act.

5. *A Significant Benefit Has Been Conferred on the General Public or a Large Class of Individuals*

The second prong of the analysis is whether " 'a significant benefit has been conferred on the general public or a large class of individuals.' " (*Save Our Heritage, supra*, 11 Cal.App.5th at p. 159.) " ' "[T]he 'significant benefit' that will justify an attorney fee award need not represent a 'tangible' asset or a 'concrete' gain but, in some cases, may be recognized simply from the effectuation of a fundamental constitutional or statutory policy." [Citation.] The benefit may be conceptual or doctrinal [citation], and the California Supreme Court has recognized that "the litigation underlying the section 1021.5 award can involve rights or benefits that are somewhat intangible." ' " (*Sweetwater Union, supra*, 36 Cal.App.5th at p. 991.)

In *Sweetwater Union*, we concluded that when a school district successfully enforced the geographic restrictions of the Charter Schools Act, the trial court was within its discretion to conclude that the school district conferred a significant benefit on the general public. (*Sweetwater Union, supra*, 36 Cal.App.5th at p. 991.) We stated, "[T]he trial court could have reasonably concluded that [the school district's] action advanced the public's interest in the lawful operation of charter schools and the Legislature's oversight objectives reflected in the [Charter Schools Act's] location requirements. Even more broadly, the trial court could have found that through this action [the school district] has helped preserve the constitutionality of charter schools within the public education system. The

30

trial court could have reasonably concluded that advancement of these objectives conferred a significant benefit on the general public." (*Ibid.*)

Here, as in *Sweetwater Union*, one significant benefit conferred by the Charter School Corporate Entities' success in defeating the postjudgment motions is the advancement of "the public's interest in the lawful operation of charter schools." (*Sweetwater Union, supra*, 36 Cal.App.5th at p. 991.) More importantly, because the result was that Diego Valley East, Diego Hills Central, and the relevant SDWIHS locations could *continue* to operate, the Charter School Corporate Entities succeeded in conferring the significant benefit of preserving expanded school choice for the residents in areas with access to those schools. (*Today's Fresh Start, supra*, 57 Cal.4th at pp. 205-206 [the Legislature intended charter schools to "promot[e] innovation, choice, accountability, and competition."]; Ed. Code, § 47601, subd. (e) [the intent of the Legislature in enacting the Charter Schools Act included "[p]rovid[ing] parents and pupils with expanded choices in the types of educational opportunities that are available within the public school system."].)

Not only did the Charter School Corporate Entities confer the significant benefit of preserving expanded school choice, that benefit was conferred on a large number of individuals. For one thing, the Charter School Corporate Entities' success in this action positively impacted the sizable number of specific individuals who *already* had a relationship with Diego Valley East, Diego Hills Central, and the relevant SDWIHS locations. The Charter School Corporate Entities explain that over 1,200 current students would have been directly impacted if those schools were forced to close. The closure would therefore impact *thousands* of people, comprising those students, their families, and any other students who might have been

31

interested in attending Diego Valley East, Diego Hills Central, and the relevant SDWIHS locations in the future. (See *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 578 [a lawsuit conferred a significant benefit on the general public or a large class of individuals when it "benefited *thousands* of consumers and potentially *thousands* more by acting as a deterrent to discourage lax responses to known safety hazards" (italics added)].) In addition, the trial court's injunction prevented the Charter School Corporate Entities from operating any other *future* charter school facilities within the boundaries of Grossmont Union and SDUSD. By obtaining a reversal of that injunction, the Charter School Corporate Entities conferred a benefit on an undetermined number of additional students who might have wanted to attend potential *future* charter schools covered by the trial court's injunction.

Grossmont Union and SDUSD argue that the Charter School Corporate Entities' success in *Grossmont 2021* did not "serve a significant public interest" because *Grossmont 2021* "had no precedential value at the time" and "had no significance to any other entity in the state" other than the Charter School Corporate Entities. Specifically, they refer to the fact that, effective January 2020, the Legislature eliminated the Unable-to-Locate exception in Education Code section 47605.1 (Stats. 2019, ch. 487, § 2), while providing a grandfather clause for preexisting charter schools to continue to operate until required to renew their charters. (Ed. Code, § 47605, subd. (a)(5)(A).) It is unclear whether, in making this argument, Grossmont Union and SDUSD intend to address the first prong or the second prong of the applicable analysis, as the phrase "serve a significant public interest" mixes together words and concepts from both prongs. (See *Save Our Heritage, supra*, 11 Cal.App.5th at p. 159 [describing " 'a three-prong test inquiring whether (1) the litigation resulted in the enforcement of an important right

affecting the public interest, (2) a significant benefit has been conferred on the general public or a large class of individuals . . . .' "].)

In any event, the argument lacks merit. Clearly, *unpublished Grossmont 2021* did not create any applicable legal precedent concerning the Unable-to-Locate exception. However, as we have explained, the important right affecting the public interest, as well as the significant benefit conferred on the general public stems from the fact that Diego Valley East, Diego Hills Central, and the relevant SDWIHS locations will be able to continue operating, and the Charter School Corporate Entities will be able to continue providing expanded educational choice to residents that live within or near the boundaries of Grossmont Union and SDUSD.

6.      *The Trial Court Did Not Properly Examine Whether the Necessity and Financial Burden of Private Enforcement Renders a Fee Award Appropriate*

The third and final prong of the analysis considers whether " 'the necessity and financial burden of private enforcement renders the award appropriate.' " (*Save Our Heritage, supra*, 11 Cal.App.5th at p. 159.)

Our Supreme Court has explained that "the necessity and financial burden requirement ' "really examines two issues: whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys." ' " (*Whitley, supra*, 50 Cal.4th at p. 1214.)

The trial court's ruling devoted only two sentences to the necessity and financial burden requirement. The trial court stated, "As to the necessity and burden of private enforcement, this element is met because no public entity or official pursued enforcement or litigation against [Grossmont Union and SDUSD], which are public entities, regarding the proper interpretation of the [Charter Schools Act]. Thus, the financial burden of private enforcement is

33

such as to make a fee award appropriate here."  As we will explain, the trial court's discussion demonstrates that it did not properly exercise its discretion because it did not separately address the two issues subsumed under the necessity and financial burden requirement.

The first distinct issue involves " ' "whether private enforcement was necessary." ' " (*Whitley, supra*, 50 Cal.4th at p. 1214.)  The " 'necessity . . . of private enforcement' has long been understood to mean simply that public enforcement is not available, or not sufficiently available." (*Id.* at p. 1215.)  A fee award "is not appropriate when the public rights in question were adequately vindicated by governmental action." (*Ibid.*)  Conversely, where the opposing party in the litigation is, in fact, the sole governmental agency with the power to grant relief regarding the public right at issue, an award is appropriate.  (*Ibid.*)  Here, no governmental entity stepped in to defend the Charter School Corporate Entities against the closure of the charter schools and the permanent injunction sought by Grossmont Union and SDUSD in the postjudgment motions.  The resolution of the first issue therefore favors an award of attorney fees to the Charter School Corporate Entities.  Although the trial court's analysis of this issue was somewhat truncated, we understand it to have determined that private enforcement was necessary because no public entity or official came to the defense of the Charter School Corporate Entities with respect to the issues litigated in the postjudgment motions.

The second issue focuses on " 'the financial burdens and incentives involved in' " a party's participation in a lawsuit.  (*Whitley, supra*, 50 Cal.4th at p. 1215.)  Under this inquiry, " ' "[a]n award . . is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the [party]

34

'out of proportion to his individual stake in the matter.' " ' " (*Ibid.*)  The analysis focuses "not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield." (*Ibid.*)  An offsetting financial benefit may take the form either of a monetary award in the litigation or any other type of immediate and direct financial benefit that a party expects to obtain from the litigation. (*People v. Investco Management & Development LLC* (2018) 22 Cal.App.5th 443, 468-470 (*Investco*).)  The goal of the analysis is " 'to place the estimated value of the case beside the actual cost and make the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in [the] case.' " (*Whitley*, at p. 1216.)

Because the required analysis involves a weighing of the financial burdens and benefits, where the "potential financial benefit is indirect and speculative . . . a trial court does not abuse its discretion in concluding that the financial burden criterion is satisfied for purposes of section 1021.5." (*Investco, supra*, 22 Cal.App.5th at p. 470.)  "No abuse in awarding fees can be found where the facts show 'that the [party's] "future money advantage . . . is *speculative*" [citation], or that the [party's] " 'pecuniary benefit will be *indirect and uncertain.*' " ' " (*Sweetwater Union, supra*, 36 Cal.App.5th at p. 992, italics added.)

In their trial court briefing, the Charter School Corporate Entities did not attempt to quantify the financial benefit that they would receive from successfully defending against the postjudgment motions, or to weigh that benefit against the financial burden of the litigation.  Instead, the Charter School Corporate Entities argued (1) they received no significant financial benefit from their successful defense of the postjudgment motions because they merely preserved the status quo, which allowed them to receive public

funding and then apply it to educating students; and (2) any financial benefit was merely indirect and speculative.

In ruling on the motion for an award of attorney fees, the trial court did not address the issue of " 'the financial burdens and incentives' " involved in the Charter School Corporate Entities' defense of the postjudgment motions. (*Whitley, supra*, 50 Cal.4th at p. 1215.) Instead, the trial court mixed together the two separate issues of *the necessity* of pursuing the litigation, on the one hand, with *the financial burdens and benefits* of pursuing the litigation on the other. Conflating the two separate issues, the trial court appears to have reasoned that because it was necessary for the Charter School Corporate Entities to provide their own defense to the postjudgment motions, "the financial burden of private enforcement [was] such as to make a fee award appropriate." This discussion shows that the trial court was unaware of its obligation, to consider not only the necessity of the Charter School Corporate Entities' participation in the litigation to "vindicate[ ]" the "public rights in question" (*ibid.*), *but also* to weigh financial burdens and benefits to determine " 'whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case.' " (*Id.* at p. 1216.)[9]

---

[9]     We note that in 2017, in awarding attorney fees to Grossmont Union pursuant to section 1021.5, the trial court applied the proper legal standards, as it expressly addressed whether, in light of the financial burdens and benefits, Grossmont Union was entitled to an award of fees. In that ruling, the trial court determined that any financial benefit to Grossmont Union was from "an increase [in] average daily attendance," which was "indirect and speculative." In ruling on the Charter School Corporate Entities' attorney fees motion, in contrast, although the Charter School Corporate Entities also contended that any financial benefit to them was indirect and speculative, the trial court did not acknowledge or specifically rule upon that issue.

In an appeal from a ruling on a motion for attorney fees pursuant to section 1021.5, " ' "we must pay ' "particular attention to the trial court's stated reasons in denying or awarding fees and [see] whether it applied the proper standards of law in reaching its decision." ' " ' " (*City of Oakland, supra*, 29 Cal.App.5th at p. 698.) Here, the trial court's ruling affirmatively demonstrates that it acted based on a misunderstanding of the applicable legal standards, as it failed entirely to apply one of the essential components for deciding whether fees should be awarded under section 1021.5. Specifically, the trial court did not undertake to determine whether, in light of the financial burdens and financial benefits to the Charter School Corporate Entities from defending against the postjudgment motions, the Charter School Corporate Entities were entitled to an award of fees. " 'A trial court abuses its discretion when it applies the wrong legal standards applicable to the issue at hand.' . . . ' "[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue." ' " (*Minick v. City of Petaluma* (2016) 3 Cal.App.5th 15, 25, citations omitted.) Accordingly, because it did not apply the correct legal standard, the trial court abused its discretion in determining that the Charter School Corporate Entities were entitled to a fee award.

As we have discussed, it is the role of the trial court, in the first instance, to exercise its discretion to determine, based on the applicable legal standards, whether an award of attorney fees is warranted pursuant to section 1021.5. (*Baggett, supra*, 32 Cal.3d at p. 143). Accordingly, we will remand for the limited purpose of allowing the trial court to exercise its discretion as to whether, in light of " 'the financial burdens and incentives' " involved in the Charter School Corporate Entities' defense of the

37

postjudgment motions (*Whitley, supra*, 50 Cal.4th at p. 1215), the Charter School Corporate Entities are entitled to an award of fees. (See *Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 402-403 [remanding for the trial court to apply the proper legal standard in reaching a determination "regarding the 'financial burden of private enforcement' criterion contained in section 1021.5"].)[10]

As we have found no abuse of discretion with respect to the other aspects of the trial court's analysis of the prerequisites for an award of

_____

[10] We note that at oral argument we questioned counsel for Grossmont Union and for the Charter School Corporate Entities as to whether it was possible to calculate the financial benefit that the Charter School Corporate Entities would obtain from successfully defending against the postjudgment motions. Counsel for the Charter School Corporate Entities agreed that by using historical figures it was possible to "get an approximation" as to certain of the financial benefits. Specifically, historical figures could be used to determine (1) the public funding Diego Plus received for Diego Valley East and Diego Hills Central, and (2) the public funding Western Educational received for the relevant SDWIHS locations. From those figures, along with any other pertinent information, it may be possible to approximate the financial impact to the Charter School Corporate Entities had they not successfully defended against the postjudgment motions. As also discussed during oral argument, the analysis of financial benefit is complicated to some extent because (1) it may not be possible to measure the financial impact to the Charter Corporate School Entities from an injunction prohibiting any *future* charter school within the boundaries of Grossmont Union and SDUSD; and (2) the Charter School Corporate Entities include not only Diego Plus and Western Educational, who operate the schools and directly receive the public funding, but also Lifelong Learning and EAC, whose financial benefit must be calculated based on their specific role with respect to the schools and the extent to which they benefited from the public funding. We highlight these items from oral argument for the benefit of the trial court on remand, but we express no view on how the trial court should ultimately resolve the issue of " 'the financial burdens and incentives' " involved in the Charter School Corporate Entities' defense of the postjudgment motions. (*Whitley, supra*, 50 Cal.4th at p. 1215.)

attorney fees under section 1021.5, the scope of the remand shall not include a relitigation of those issues.

7.  *This Is Not an Exceptional Case Precluding an Award of Fees*

One last issue remains for us to address that impacts whether the trial court may rule, on remand, that the Charter School Corporate Entities are entitled to an award of attorney fees under section 1021.5.  Specifically, Grossmont Union and SDUSD contend that this is an exceptional case in which fees should not be awarded, *even if* the Charter School Corporate Entities are able to establish that each of the three prongs of the section 1021.5 analysis fall in their favor.

"The California Supreme Court has 'recognized an *exception* to be applied in cases where all three [section 1021.5] factors are satisfied, but the party from whom fees are sought "is not the type of party on whom private attorney general fees were intended to be imposed." ' [Citations.]  Under this exception, 'a section 1021.5 fee award may not be imposed on a litigant who did nothing to adversely affect the public interest.' " (*Save Our Heritage, supra*, 11 Cal.App.5th at pp. 160-161.)  The exception arises from the principle that "[t]he party against whom such fees are awarded must have done or failed to do something, in good faith or not, that compromised public rights." (*Adoption of Joshua S.* (2008) 42 Cal.4th 945, 954, 958 (*Joshua S.*) [the losing party in an adoption case who "only engaged in litigation to adjudicate private rights from which important appellate precedent happen[ed] to emerge, but ha[d] otherwise done nothing to compromise the rights of the public or a significant class of people" was covered by the exception].)  There is, in section 1021.5, "an implicit requirement that the

39

party on whom attorney fees are imposed be responsible for adversely affecting the public interest." (*Joshua S.*, at p. 955.)[11]

Grossmont Union and SDUSD contend that this exception applies here because, in bringing the postjudgment motions, they "pursued a reasonable litigation strategy believed to be more efficient and supported by a good faith interpretation of the trial court's authority to enforce its prior writ," and therefore did not take action " 'detrimental to the public interest.' " We reject the argument.

For one thing, the argument focuses on the purported "good faith" of Grossmont Union and SDUSD in filing the postjudgment motions, but that is not a relevant focus. As our Supreme Court has explained, there is no "bad faith requirement" for a party to be subject to an attorney fee award under section 1021.5. (*Joshua S., supra*, 42 Cal.4th at p. 958.) Instead, the party against whom fees are awarded "must have done or failed to do something, *in good faith or not*, that compromised public rights." (*Ibid.*, italics added; see also *Pasadena Police Officers Assn. v. City of Pasadena* (2018) 22 Cal.App.5th 147, 164 ["Although . . . a party must have 'done something to compromise the rights of the public' before having to pay attorney fees under section 1021.5, our Supreme Court refused to impose a 'bad faith' requirement."]; *City of San Clemente v. Department of Transportation* (2023) 92 Cal.App.5th 1131, 1156 [in applying the exception, "the question is what *effect* the conduct would have had if successful" as "[a]ny action can be redescribed to appear innocent"].)

_____

11     Grossmont Union and SDUSD incorrectly characterize the exception as being part of the first prong of the three-prong analysis. It is not. Rather, it is an exception that applies even if all three prongs have been satisfied. (*Save Our Heritage, supra*, 11 Cal.App.5th at pp. 160-161.)

The trial court could reasonably conclude that the exception did not apply because, by bringing the postjudgment motions, Grossmont Union and SDUSD were seeking to "compromise[ ] public rights" (*Joshua S., supra*, 42 Cal.4th at p. 958) and " 'adversely affect the public interest.' " (*Save Our Heritage, supra*, 11 Cal.App.5th at p. 161.) Specifically, as we explained at length while discussing the first prong of the section 1021.5 analysis (part II.A.4, *ante*), the right of the public to the expanded school choice in the public education system that the Legislature put in place by enacting the Charter Schools Act is an important public right. The postjudgment motions filed by Grossmont Union and SDUSD sought to curtail that right by requiring the closure of Diego Valley East, Diego Hills Central and certain locations of SDWIHS, and by permanently enjoining the Charter School Corporate Entities from operating any future charter school facilities within the geographic boundaries of Grossmont Union and SDUSD. "When a party initiates litigation that is determined to be detrimental to the public interest, attorney fees have been imposed." (*Joshua S.*, at p. 957.) Because Grossmont Union and SDUSD filed the postjudgment motions, which were detrimental to the public interest, they may not rely on the exception for " 'litigant[s] who did nothing to adversely affect the public interest.' " (*Save Our Heritage*, at p. 161.)

In sum, this is not an exceptional case in which an award of fees under section 1021.5 is precluded.

B.    *The Amount of the Fee Award*

Grossmont Union and SDUSD contend that the trial court abused its discretion in determining that the Charter School Corporate Entities reasonably incurred attorney fees of $582,927 in defending against the postjudgment motions. Although we are conditionally reversing and remanding for the trial court to determine whether the Charter School

41

Corporate Entities are entitled to a fee award, because the issue of the reasonableness of the fees may arise again on remand, and for purposes of judicial efficiency, we will address the challenge that Grossmont Union and SDUSD raise regarding the amount of the fee award.

1.    *Relevant Proceedings*

In litigating the postjudgment motions filed by Grossmont Union and SDUSD, the Charter School Corporate Entities were represented by (1) the law firm Blank Rome LLP (Blank Rome), who provided representation both in the trial court and on appeal; and 2) the law firm Horvitz & Levy LLP (Horvitz & Levy), who provided representation solely on appeal and was primarily responsible for drafting the appellate briefing.  Blank Rome billed $440,668 for its work, and Horvitz & Levy billed $277,564.50.  The amount billed by Blank Rome was composed of (1) $414,530 for work related to the postjudgment motions in the trial court and on appeal; (2) $18,398 in fees associated with the Charter School Corporate Entities' motion for attorney fees; and (3) an additional $7,740 in fees associated with the supplemental briefing that the trial court requested concerning the reasonableness of the fees.  The full amount sought by the Charter School Corporate Entities in their fee motion was $718,232.50.

The trial court concluded that the Charter School Corporate Entities "partially failed to show the reasonableness of the fees claimed."  After a lengthy explanation of why it questioned the reasonableness of some of the fees, the trial court ruled as follows:

> "Therefore, the court awards $582,927 in attorney's fees as follows:
>
> "1) $294,502.50 for work performed by Blank Rome ($174,475 for trial work and $120,027.50 for appellate work);

42

"2) $277,564.50 for appellate work performed by Horvitz & Levy;

"3) $10,860 in fees associated with the motion for attorney's fees; and

"4) $7,740 in additional claimed fees related to the supplemental briefing is denied."

In explaining why it awarded $582,927, rather than $718,232.50, as requested by the Charter School Corporate Entities, the trial court cited several factors.

First, the trial court stated that the billing records supplied by Blank Rome "obscure[d] the nature of the work performed," made it "unclear whether the time devoted to various tasks was reasonable and justified," and made it unclear "whether the level of staffing was necessary and whether the rates charged by the individuals that worked on the case are justified." As the trial court observed, these problems were not entirely remedied by the supplemental briefing that the trial court requested.

Second, the trial court specifically focused on the staffing of the appeal. It explained, "Considering that Horvitz & Levy is admittedly an established law firm, exclusively specializing in appellate litigation, and the fact Blank Rome performed a significant amount of the appellate work, it appears the case was unnecessarily overstaffed at the appellate level. In this regard, the court is not persuaded that the complexity, novelty and expedited nature of the writ motions justified the number of staff that worked on this case."

Third, the trial court stated that, for several reasons, the amount of fees incurred by Blank Rome in connection with the attorney fee motion was unreasonably high.

43

Finally, the trial court stated that "the rates charged by Blank Rome and Horvitz & Levy do not reflect the rates prevailing in the community of San Diego where the lawsuit took place."[12] The trial court questioned the billing rates of certain Blank Rome attorneys, and it further observed that the Charter School Corporate Entities had "not presented any evidence of the rates prevailing in the community of San Diego, or presented evidence that engaging out-of-town counsel was necessary under the circumstance of this case."

The trial court also explained that in setting the amount of the fee award it was taking into consideration the factors set forth in *Serrano v. Priest* (1977) 20 Cal.3d 25, 49, as well as other factors. As the trial court explained, the factors in favor of an increased award were "the litigiousness and tactics of counsel, the nature and difficulty of the case, the level of skill exhibited by counsel, and the results obtained." On the other hand, a reduced award could be warranted by the consideration that Grossmont Union and SDUSD "are public school districts, and it cannot be disputed that any award to [the Charter School Corporate Entities] would ultimately fall upon the taxpayers." (*Serrano*, at p. 49 [a relevant factor in determining the amount of a fee award is "the fact that an award against the state would ultimately fall upon the taxpayers"].)

In the end, the trial court reduced the amount of fees requested by approximately 19 percent, from $718,232.50 to $582,927. This included an approximate 31 percent reduction of the fees billed by Blank Rome, but no reduction in the fees billed by Horvitz & Levy.

---

[12] Both firms are located in the Los Angeles area.

2. *Applicable Legal Standards*

" 'The California Supreme Court has instructed that attorney fee awards under section 1021.5 "should be fully compensatory," and absent "circumstances rendering the award unjust, an . . . award should ordinarily include compensation for all the hours reasonably spent." ' " (*The Kennedy Com. v. City of Huntington Beach* (2023) 91 Cal.App.5th 436, 465, italics omitted.) "A trial court awards attorneys' fees based on the lodestar method, i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. . . . 'The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided.' . . . Those factors include '(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award.' " (*California DUI Lawyers Assn. v. Department of Motor Vehicles* (2022) 77 Cal.App.5th 517, 535-536, citations omitted.) " 'It is not necessary to provide detailed billing timesheets to support an award of attorney fees under the lodestar method. [Citations.] Declarations of counsel setting forth the reasonable hourly rate, the number of hours worked and the tasks performed are sufficient.' [Citation.] The party seeking attorney fees has 'the burden of showing that the fees incurred were "allowable," were "reasonably necessary to the conduct of the litigation," and were "reasonable in amount." ' " (*Sweetwater Union, supra*, 36 Cal.App.5th at p. 994.)

"[T]he amount of fees awarded under section 1021.5 'is classically tested under the abuse of discretion standard.' " (*Robles, supra*, 38 Cal.App.5th at p. 199, italics omitted.) " '[T]he "experienced trial judge is the best judge of the value of professional services rendered in his [or her]

45

court, and while his [or her] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' " (*Early v. Becerra* (2021) 60 Cal.App.5th 726, 743-744.) " 'Fees approved by the trial court are presumed to be reasonable, and the objectors must show error in the award.' " (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488.)

        3.      *The Trial Court Did Not Abuse Its Discretion*

Grossmont Union and SDUSD specifically challenge the amount of fees that the trial court awarded in connection with the appellate work that resulted in *Grossmont 2021*. They contend that the trial court properly made reductions to the amount of fees sought by the Charter School Corporate Entities for their efforts opposing the postjudgment motions *in the trial court*, but "with respect to their fees on appeal, the trial court awarded [the Charter School Corporate Entities] their *entire* request—just under $400,000 for drafting" their appellate briefing.[13] Grossmont Union and SDUSD complain that the trial court criticized "the staffing levels, the hours billed, *and* the rates charged, yet still awarded two law firms every penny they asked for . . . for one appeal." They argue that "there is a complete disconnect between the trial court's blistering denunciation of every aspect of [the Charter School

---

[13]    Grossmont Union and SDUSD twice incorrectly state that the appellate fees were for drafting "one Respondents' Brief." In fact, the Charter School Corporate Entities were the appellants, and thus filed an opening brief and a reply brief. Grossmont Union and SDUSD do get it correct at one point in their brief, referring to "one Opening Brief and one Reply Brief."

Corporate Entities'] fee application and its ultimate ruling," which constitutes "an abuse of discretion that cannot stand."[14]

The argument fails as to Blank Rome's appellate fees because Grossmont Union and SDUSD fail to adequately support it with citations to the record. To support their contention that an award of $120,027.50 is an award of the *full* amount of Blank Rome's appellate fees, Grossmont Union and SDUSD provide a citation to an exhibit that separately sets forth the number of hours that counsel for the Charter School Corporate Entities spent on trial court litigation from the hours that counsel for the Charter School Corporate Entities spent on the appeal. However, that exhibit is limited to information about the *hours* billed. It does not explain the *amounts* billed. Therefore, the exhibit does not show how much Blank Rome billed for its appellate work.[15] In our review of the record, we have not located any statement about the amount that Blank Rome billed for its appellate work. It appears that to extract that information from the record, someone would have to perform mathematical calculations and engage in a close analysis of the Blank Rome invoices, which Grossmont Union and SDUSD have not

_____

14    For the first time in their appellate reply brief, Grossmont Union and SDUSD argue that the trial court should have evaluated each of the Charter School Corporate Entities "individually" to determine whether the attorney fees as to certain of them should have been disallowed. That argument, raised for the first time in the reply brief, has been forfeited. (*Rangel, supra*, 62 Cal.4th at p. 1218.)

15    Citing the exhibit we have described, Grossmont Union and SDUSD suggest in a parenthetical statement that they have calculated that Blank Rome's fees for its work in the trial court on the postjudgment motions totals "approximately $307,000." They provide no explanation of how they arrived at that figure, which is not apparent in the cited exhibit.

done.  Accordingly, Grossmont Union and SDUSD have not provided support for their argument that the trial court abused its discretion with respect to the amount it awarded for Blank Rome's appellate work.[16]

With respect to Horvitz & Levy's appellate work, that firm billed $277,564.50, and the trial court awarded the full amount.  However, Grossmont Union and SDUSD have not established that the trial court abused its discretion in that regard.  As Grossmont Union and SDUSD point out, the trial court did conclude that the appeal was overstaffed.  However, because, as we have discussed, we do not know what portion of Blank Rome's appellate fees were awarded, the trial court may have addressed the appellate overstaffing by reducing Blank Rome's fees.  Second, the trial court did observe that Horvitz & Levy's rates were higher than the prevailing rates in San Diego.  However, the trial court could still have acted reasonably in awarding the full amount of Horvitz & Levy's fees.  As the trial court noted, Horvitz & Levy is "an established law firm, exclusively specializing in appellate litigation."  Further, as the trial court noted, the factors in favor of an increased fee award in this case included "the nature and difficulty of the case, the level of skill exhibited by counsel, and the results obtained."  Based on these observations, and especially in light of the success that Horvitz &

---

[16]    Although the argument is not clearly made, Grossmont Union and SDUSD also appear to be challenging the fee award based on the trial court's comment that, even after receiving supplemental briefing, deficiencies in the evidence concerning Blank Rome's fees still remained, and it was therefore unable to ascertain the reasonableness of some of the fees.  To the extent Grossmont Union and SDUSD base their appellate challenge on this observation, it lacks merit.  They have not established that the trial court included in its award any of the fees for which it had insufficient information.

Levy obtained on appeal, the trial court did not abuse its discretion with respect to Horvitz & Levy's fees.[17]

DISPOSITION

The order awarding attorney fees to the Charter School Corporate Entities is conditionally reversed and remanded.  The trial court is specifically authorized, on a limited remand, to hold any necessary proceedings to examine the issue of whether, in light of the "financial burden of private enforcement" (§ 1021.5, subd. (b)), the Charter School Corporate Entities are entitled to an award of attorney fees.  If the trial court concludes that a fee award is warranted, it shall reinstate the award in the amount of $582,927 and shall add thereto any additional fees that the Charter School Corporate Entities reasonably incurred in this appeal and on remand.  The parties shall bear their own costs on appeal.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.

---

[17]    Even as to Blank Rome's appellate fees, had Grossmont Union and SDUSD been able to establish that the trial court *did* award the full amount of those fees, we would nevertheless conclude that based on the success that the Charter School Corporate Entities experienced on appeal, the trial court would have been within its discretion to award the full amount of the appellate fees incurred by Blank Rome.